# EXHIBIT A

**IN THE CIRCUIT COURT OF
THE FIRST JUDICIAL DISTRICT
IN AND FOR SANTA ROSA COUNTY**

CIVIL DIVISION

CASE NO. :

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

**PUBLIC REDACTED**

*Plaintiff,*

v.

SNAP INC.,

*Defendant.*

_____/

## COMPLAINT

1.      There is a widespread consensus among parents, teachers, and experts in teen mental health that compulsive use of social media is harmful to teens' well-being. Last year, bipartisan supermajorities of both houses of the Florida Legislature acted to address this problem by enacting H.B. 3, 2024 Leg., Reg. Sess. (Fla. 2024) (codified at §§ 501.1736–.1738, Fla. Stat. (2024)). H.B. 3 identifies five addictive design features that some social media platforms use to promote behavioral addiction and compulsive use, and it prohibits covered social media platforms that deploy those features from contracting with and providing accounts to people who they know are 13 years old or younger. H.B. 3 also requires that covered social media platforms obtain parental consent before contracting with and providing accounts to people who they know are 14 or 15 years old.

2.      Snap Inc. operates the Snapchat social media platform, which is enormously popular among Florida teenagers. It has acknowledged in other litigation that it is subject to H.B. 3, yet it is openly defying this important public health measure. Snap's conduct is particularly

egregious because it continues to market Snapchat in Florida as safe for users as young as 13 even though it knows that Snapchat can be easily used to access pornography and buy drugs, among many other dangers. Rather than obeying Florida law by removing 13-year-old users from the platform and seeking parental consent for 14- and 15-year-old users, Snap is actively deceiving Florida parents about the risks of allowing their teens to access this platform.

3.      Through this lawsuit, the Attorney General seeks to compel Snap to comply with its obligations under H.B. 3 as well as the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA"), which prohibits the unfair and deceptive business practices that Snap has used to build its vast and lucrative Florida user base.

## PARTIES

4.      Plaintiff, the Attorney General of the State of Florida, is authorized to enforce H.B. 3 and FDUTPA. The Attorney General has investigated the matters alleged in this Complaint and has determined that this enforcement action serves the public interest as required by § 501.207, Fla. Stat.

5.      Defendant Snap Inc. ("Snap") is a for-profit entity incorporated in Delaware. Snap is headquartered at 3000 31st Street, Santa Monica, California. In the last quarter of 2024, Snap's average revenue per user in North America was less than $10. But thanks to its vast user base, Snap's North American operations yielded over $3.2 billion in revenue for the company in 2024.

## JURISDICTION AND VENUE

6.      This is an action for statutory and equitable relief under H.B. 3 and FDUTPA. Under those statutes, the Attorney General seeks relief in an amount greater than Fifty Thousand Dollars ($50,000), exclusive of fees and costs.

7.      Snap's statutory violations occurred in or affect more than one judicial circuit in the State of Florida, including the First Judicial Circuit in and for Santa Rosa County.

8.      This Court has subject matter jurisdiction over this matter under § 501.207(3), Fla. Stat.

9.      Venue is proper in this Court because allegations in this Complaint establish that the cause of action accrued in Santa Rosa County. *See* § 47.051, Fla. Stat.

10.     This Court has personal jurisdiction over Snap under Florida's long-arm statute, § 48.193(1)(a), Fla. Stat., because Snap has substantial contacts in Florida.

11.     Snap has millions of users in the State of Florida, including tens of thousands of users who are under 16 years old. Snap generates millions of dollars of annual revenue by making Snapchat available to users in Florida.

12.     Whenever someone downloads and signs up for an account on Snapchat, they agree to Snap's Terms of Service, which is a contract between the user and Snap. Under that contract, the user agrees to allow Snap to collect data about the user, including the user's location. In return, Snap makes the Snapchat application available to the user. This contractual relationship involves ongoing performance by both parties, with both the user and Snap performing under the contract each time the user accesses Snapchat.

13.     The content that Snapchat displays to users is determined in part by the user's location. For example, a user of Snapchat in Florida is more likely to see content related to the Florida State Seminoles football team because he is in Florida.

14.     Snap sells advertisements to third parties to target users in Florida, including advertisers located in Florida and advertisers located outside the state seeking to reach users in the state. The advertisements on Snapchat are targeted at users based in part on their location. For

example, a user of Snapchat located in Pensacola might see advertisements for a local Pensacola florist due to his location.

15.    Snap also targets the Florida market in other ways. ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████

16.    The conduct described in this Complaint and the harm it causes arise from Snap's activities directed to Florida and to Snapchat users in Florida.

## FACTUAL ALLEGATIONS

I.    **Overview of Snapchat**

17.    The Snapchat app ("Snapchat") is a social media platform that enables its users to create, share, and consume digital content—primarily photos and videos. The major elements of Snapchat, as they exist today, are briefly described below.

18.    Generally, Snapchat opens to a screen on which the user can take photos or videos through the device's camera. Users may create content by taking photos or videos on this screen.

19.    Snapchat allows users to make various modifications to such photos or videos. Such modifications include the addition of user-generated text, user-generated freehand drawings, and the addition of other supplementary content created by Snap. One kind of such supplementary content is branded as "Lenses," which, generally, alter the appearance of human faces or other content in photos or videos.

20.     Photos and videos thus taken and modified are, generally, known as "snaps." Users may also create content by importing existing photos stored on their devices and applying, if the users so choose, the same modifications.

21.     Various elements of Snapchat allow these snaps to be shared with other Snapchat users. One such element of Snapchat allows Snaps to be shared with one, or a group, of the user's contacts ("Friends") on Snapchat. A closely related element, known as "Chat," also allows text, rather than snaps, to be shared with one or a group of the user's contacts, in a manner akin to traditional text messaging. Generally, to share content via these elements, a user will first have to have added another user as a contact.

22.     Generally, snaps or texts sent via these two methods are ephemeral: they are available for viewing for a limited period, on the order of days, and, once viewed, can only be displayed for a limited period, on the order of seconds for snaps and days for Chats.

23.     For these two elements, Snapchat displays to a user various metrics of the frequency of correspondence between the user and his contacts. One such metric, known as "Snapstreaks," generally records for how many consecutive days both users have sent snaps to one another. Another set of metrics ranks relatively, without exact numbers, the users with whom a user most frequently communicates, known as his "Best Friends."

24.     A user may also send snaps or Chats to the "My AI" element, which generates responses using generative artificial intelligence. In terms of the user interface, the user exchanges content with the "My AI" in the same way that he would exchange content with one of his other Snapchat contacts.

25.     Another element, which allows snaps to be shared and consumed in a different manner, is known as "Stories." Stories consist of one or more Snaps which are made available to

a certain set of other users for viewing. Snaps posted to Stories are, generally, available for viewing for 24 hours and can be viewed by other users an unlimited number of times within that period.

26.    Often, a user will post a Story in which snaps are made available to all the user's contacts. The user may also post to other Stories in which snaps are made available to different sets of users of Snapchat.

27.    A user can add contacts for purposes of the above-described methods of communication in various ways. Snap refers to such contacts as "Friends" even though the so-called "Friends" on Snapchat may not actually know each other in real life.

28.    The element known as "Search," among other things, allows users to search for users whom they might add as a contact. The results of the search are based both on the user's input search term and the user's activity on the app.

29.    The element known as "Find Friends" recommends to a user other users whom he should add as "Friends." Find Friends makes its recommendations based on an algorithm that takes into account the user's activity on Snapchat.

30.    In addition to allowing the consumption of content created by a user's contacts, Snapchat also allows a user to consume snaps created by users of the platform whom he has not added as a contact.

31.    Snapchat's "Snap Maps" element allows users to view snaps that are associated with physical locations on a map. Snaps on Snap Map may, generally, be submitted by any user of Snapchat.

32.    Snapchat's "Spotlight" element allows users to view short-video snaps in a feed through which users can endlessly scroll and in which videos play automatically, much like TikTok. Snaps in Spotlight may, generally, be submitted by any user of Snapchat. Of the submitted

content, Snapchat recommends the next Snap to a user based on an algorithm that takes into account the user's activity on the platform.

33.    Snapchat's "Discover" element allows users to view snaps and other photo and video content in a feed through which users can endlessly scroll and in which videos play automatically. Snaps in Discover may, generally, be submitted only by certain semi-professional users of Snapchat or professional publishers with whom Snap has entered into agreements for this purpose. Of the submitted content, Snapchat recommends the next Snap to a user based on an algorithm that takes into account the user's activity on the platform.

34.    Snap also offers, for a recurring fee, its Snapchat+ product, which adds a set of many additional elements to the Snapchat app, which are unavailable to non-paying users. One such additional element, for example, is the capability for a user to view the "Best Friends" of other users.

35.    Snap also allows users to make in-app purchases. For example, a user may opt to pay a one-time fee to restore a "Snapstreak" that has ended.

36.    Young people are a critical user base of Snapchat. CEO Evan Spiegel remarked that he and his cofounder "were thrilled to hear that most of [Snapchat's users] were high school students who were using Snapchat as a new way to pass notes in class—behind-the-back photos of teachers and funny faces were sent back and forth throughout the day. Server data supported this and we saw peaks of activity during the school day and dips on the weekends."[1]

37.    Snap says its app "delivers on the emotions that Gen Z seeks and it does so consistently across the platform. . . . Remember, this is a group that plays a major role in this eye-

---

[1] Spiegel Evan, *Let's Chat,* SNAP INC., https://perma.cc/AE97-TZ3L.

popping stat: People who use Snapchat open the app 30+ times a day and send 4 billion+ messages."[2]

38.    Today, millions of young people in the United States use Snapchat. According to the Pew Research Center, 55% of teens use Snapchat, 48% of them use it "daily," and 13% say that they are on Snapchat "almost constantly."[3] A 2025 survey of 11- to 13-year-olds in Florida found that 47% of Floridians in this age cohort have Snapchat accounts.[4]

## II.    Snap's Open Defiance of H.B. 3

### A.    The Florida Legislature Enacts H.B. 3 To Address a Mental Health Crisis Among Teenagers Caused by Behavioral Addiction to Social Media.

39.    Something has gone wrong in the lives of American teenagers. Since the early 2010s, studies examining adolescent well-being have documented increasing symptoms of depression, loneliness, and unhappiness, with rates of major depression among teenagers more than doubling.

40.    The early 2010s was also a turning point for American teens' use of technology. Teen smartphone ownership more than tripled between 2011 and 2015. Smartphones with front-facing cameras (which make it easier to take selfies) were introduced in 2010, and over the ensuing years teenagers' use of social media exploded. By 2017, 78% of 8th graders reported that they used social media almost every day.

41.    A robust body of research shows that social media use is responsible for the nationwide teen mental health crisis. Increased use of social media among teens is associated with increased rates of depression. Teenagers who are heavy social media users are also more likely to

---

[2] *What Does Gen Z Want From Brands?*, SNAP INC., https://perma.cc/LCM9-69NH.

[3] Michelle Faverio & Olivia Sidoti, *Teens, Social Media and Technology 2024*, PEW RESEARCH CENTER (Dec. 12, 2024), https://perma.cc/YF89-XYZW.

[4] J. Martin, et al., *The Life in Media Survey: A baseline study of digital media use and well-being among 11- 13-year-olds* at 26, LIFE IN MEDIA SURVEY, https://perma.cc/P5HU-V96W.

report that they have hurt themselves on purpose. Experiments on social media use further support the same conclusion, showing that teens who give up or reduce their social media use have less anxiety and depression compared to those who do not. Compulsive social media use at nighttime has also been shown to have an adverse and clinically significant effect on teens' sleep, thereby interfering with cognitive development, performance in school, and overall well-being.

42.    One of the major mechanisms through which social media use causes mental health problems in teens is through behavioral addiction. A behavioral addiction occurs when someone fails to resist engaging in behaviors or experiences that are compelling in the short run despite harming their well-being in the long run. When a teenager becomes addicted to social media, it crowds out other activities that promote psychological well-being and healthy cognitive development such as time with family and friends, physical activity, and sleep.

43.    The harms visited on young people by compulsive use of social media are a direct result of the intentional design choices of the owners of certain social media platforms, including Snap. As the U.S. Surgeon General explained in a recent advisory, social-media platforms deploy features like "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations" that lead to "excessive use and behavioral dysregulation."[5] Those features "overstimulate the reward center in the brain" and "trigger pathways comparable to addiction," resulting in "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." The Surgeon General noted that "we are experiencing a national youth mental health crisis" and called on lawmakers to "act swiftly" to "limit[] the use of [addictive] features" by platforms.[6]

---

[5] Office of the Surgeon General, Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory at 9 (2023), https://perma.cc/3GPW-XDBY.
[6] Id. at 13, 15.

44.     The Florida Legislature answered the Surgeon General's call for action by enacting H.B. 3. This statute applies to social media companies that have *all* of the following characteristics: (1) "Allows users to upload content or view the content or activity of other users;" (2) "Ten percent or more of the daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on the . . . application on the days when using the . . . application;" (3) "Employs algorithms that analyze user data or information on users to select content for users"; and (4) has at least one of five enumerated "addictive features." § 501.1736(1)(e), Fla. Stat.

45.     H.B. 3 requires that "[a] social media platform shall prohibit a minor who is younger than 14 years of age from entering into a contract with a social media platform to become an account holder." § 501.1736(2)(a), Fla. Stat.

46.     H.B. 3 further requires that "[a] social media platform shall prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder, unless the minor's parent or guardian provides consent for the minor to become an account holder." § 501.1736(3)(a), Fla. Stat.

47.     Snap is subject to H.B. 3 because it meets the above statutory definition of a covered social media company. In a signed declaration made under penalty of perjury and filed in federal court, a Snap executive admitted that "Snap is likely covered by the law."

48.     Despite being subject to H.B. 3, Snap contracts with and provides accounts to Florida users who it knows are younger than 14. It also fails to seek parental consent before contracting with and providing accounts to Florida users who it knows are 14 or 15 years old. Snap is openly and knowingly violating H.B. 3, and each violation constitutes an unfair and deceptive trade practice under FDUTPA. § 501.1737(5)(a), Fla. Stat.

**B. Snap's Ongoing Use of Addictive Design Features Identified in H.B. 3 Harms Florida Teens.**

49.     As noted above, H.B. 3 only applies to social media platforms that use at least one of five enumerated "addictive features." § 501.1736(1)(e)(4), Fla. Stat. Snapchat utilizes four of the five such features identified in H.B. 3.

50.     First, Snapchat uses "[i]nfinite scrolling," which includes "content that loads as the user scrolls down the page without the need to open a separate page" and "the use of pages with no visible or apparent end or page breaks." § 501.1736(1)(e)(4)(a), Fla. Stat. Infinite scrolling is harmful and promotes behavioral addiction because it eliminates natural stopping cues that would otherwise demarcate episodes of use. Without such stopping cues, people tend to allow an episode of use to continue by default, and research shows that infinite scrolling contributes to compulsive use of social media.

51.     Stories, Spotlight, and Discover all present content via infinite scrolling, and ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████

52.     Second, Snapchat uses "[p]ush notifications," which are alerts that appear on a user's phone screen when they are not using Snapchat that are designed to entice the user back onto the app. *See* § 501.1736(1)(e)(4)(b), Fla. Stat. Push notifications exploit users' natural

11

tendency to seek and attend to environmental feedback, serving as distractors that monopolize attention. Young users are especially sensitive to these triggers and less able to control their response and resist reopening the app. Snapchat sends push notifications to users, regardless of age, frequently and at all hours of the day and night. They disrupt young people at school and interfere with homework, time with family and friends, and sleep.



54.     Third, Snapchat "[d]isplays personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted content." § 501.1736(1)(e)(4)(c), Fla. Stat. Such interactive metrics are powerful sources of feedback that drive engagement by activating neural circuits in the brain that are associated with reward processing. Research has found that adolescents show increased sensitivity to feedback provided through interactive metrics and that their engagement with social media is driven more strongly by this feedback.

55.     Snapchat includes a variety of interactive personal metrics, including a button on the Spotlight page that shows the number of times a video has been reposted as well as a "Snapscore"—a number that appears on each user's public profile that reflects the type and volume of engagements the user has undertaken on Snapchat. The higher a user's Snapscore, the higher that user's engagement on Snapchat.

56.     Perhaps the most problematic interactive metric on Snapchat is Snapstreaks. A

Snapstreak is a designation Snapchat gives to conversations between users who exchange at least one snap per day for more than three days. When users enter a Snapstreak, a fire ball emoji appears next to their chat, and Snapchat begins showing a running tally of the number of consecutive days that users have exchanged snaps. When users are about to lose their streak (meaning one user has not sent a snap in almost 24 hours), Snapchat warns them.

57.    Snapstreaks can cause and contribute to compulsive use and social comparison in young users who are particularly vulnerable to pressures to continue Snapstreaks. Teens often view Snapstreaks as evidence of the strength of their real-life friendships, and they feel immense pressure to continue them for fear of losing their streak and potentially upsetting their real-life friends. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

58.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████ But rather than taking steps to address the harmful effects of Snapstreaks on the platform's users, Snap directly monetizes this abusive aspect of its product by offering to restore users' lost Snapstreaks for a fee. ████████████████████

████████████████████████████████████████

59.    Fourth, Snapchat uses "auto-play video or video that begins to play without the

user first clicking on the video or on a play button for that video." § 501.1736(e)(4)(d), Fla. Stat. Like infinite scrolling, auto-play of videos contributes to addictiveness by eliminating stopping cues and encouraging extended viewing sessions. ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████

60.    In sum, Snapchat includes numerous features identified in H.B. 3 that promote harmful compulsive overuse by teenagers. Despite these design features, Snap continues to make its platform available to users under 14 years' old and to 14- and 15-year-old users without parental consent in defiance of Florida law.

## III.    Additional Snapchat Design Features Promote Behavioral Addiction and Harm User Well-Being.

61.    In addition to the design features described in the preceding section, numerous other aspects of Snapchat promote behavioral addiction and cause psychological harm to Snapchat's youngest users.

*Ephemerality*

62.    Snap markets disappearing messages as one of the core features of Snapchat: at Snapchat, "Delete is our default."[7] This means most messages sent over Snapchat are automatically deleted once they have been viewed or have expired. When Snap deletes messages, it deletes them from the app and from Snapchat servers.

63.    Snap tells users that chats "are set to delete" after 24 hours, and users can change those settings to cause chats to be deleted immediately after viewing or after 7 days. Snap also says that chats in Group Chats "are deleted by default 24 hours after everyone in the Group has

---

[7] *When does Snapchat delete Snaps and Chats? – Snapchat Support*, SNAP INC., https://perma.cc/JC5P-XCTD.

viewed the Chat on the Snapchat mobile or web app or 31 days after the Chat was sent, whichever is sooner."[8] Stories are only available to view for 24 hours.

64.     The disappearing nature of Snapchat content contributes to the app's harm to young people. This aspect of Snapchat encourages users to open the app and keep coming back to it constantly, and it preys on minor users who are especially sensitive to a fear of missing content.

*Lenses*

65.     Snapchat is well known for its "lenses"—photo filters that Snap describes as "[augmented reality] experiences [that] transform the way you look and the world around you!"[9]

66.     Some Snapchat lenses fundamentally and realistically alter the appearance of a user's skin and facial features in a manner akin to plastic surgery or other cosmetic procedures. Such beauty-oriented face lenses cause many users to become unsatisfied with their real faces, leading to anxiety and sometimes driving users to seek real-life cosmetic procedures. This form of body dysmorphic disorder has been dubbed "Snapchat Dysmorphia."[10]

---

[8] *Id.*
[9] *How do I use Lenses on Snapchat?*, SNAP INC., https://perma.cc/A223-A6HL.
[10] Elle Hunt, *Faking It: How Selfie Dysmorphia Is Driving People To Seek Surgery*, The Guardian (Jan. 23, 2019), https://perma.cc/XJ9N-SGRU.

68.     Snapchat's beauty lenses harm younger users, particularly girls. Young people are still developing and forming their identities, and they are vulnerable to the negative impacts of this face-altering technology.

*Charms*

69.     Snap also uses various gimmicks to gamify users' relationships with the goal of encouraging them to increase their usage of Snapchat.

70.     "Charms are fun, special mementos that celebrate your friendships! Charms are added based on your interactions and relationships with your friends."[11] Snap says that "Charms are special surprises that are added based on your relationships with your friends and how you interact with each other. It's about having fun."

71.     Like Snapstreaks, Charms are a way for young people to evaluate their real-life friendships on Snapchat's terms. The more users interact with each other on Snapchat, the more "Charms" they receive. And, because Charms are "surprises," users are encouraged to keep up their engagement to see what new Charms might appear. Charms may even appear if users have not been communicating to specifically encourage them to restart their engagement with each other.

72.     Prior to Charms, Snapchat had Trophies, which were emojis that users could earn by engaging in certain tasks on Snapchat. The Trophies were visible to users' friends. Like Charms, Trophies were designed to encourage more engagement on Snapchat and contributed to compulsive use.

*Friend Solar System*

73.     Perhaps Snapchat's most extreme method of user manipulation is the app's

---

[11] *What are Charms on Snapchat?*, SNAP INC., https://perma.cc/88MY-NPQG.

Friend Solar System. The Friend Solar System is a feature available to users who pay for a Snapchat+ subscription. Snap explains it this way:

> As a Snapchat+ subscriber, you'll see a 'Best Friends' badge with a gold ring around it on someone's Friendship Profile. 'Best Friends' means they're among the eight friends you Snap and Chat with the most. Tapping on the badge will show you which planet you are in their Solar System, with each planet representing a different position in their Best Friends list.[12]

74.  This means that young people can see if (according to Snapchat) they are as valuable to their "friends" as their "friends" are to them. A user's friend might show up as Mercury in his solar system but only be Jupiter or Neptune in the friend's solar system.[13] This feature causes tremendous stress for young people who are acutely and uniquely vulnerable to social pressure and validation.[14] As one teen commented to the *Wall Street Journal*, "A lot of kids my age have trouble differentiating best friends on Snapchat from actual best friends in real life."



75.  In response to public backlash from parents and others, Snap turned the Friend Solar System off by default. But it is still available to users who pay the fee for a subscription to Snapchat+.

*Algorithm*

76.  Snap also recommends content using algorithms that are fine-tuned to maximize the amount of time users spend on the platform. These algorithms are designed to keep users on

---

[12] *How do Friend Solar Systems work?*, SNAP INC., https://perma.cc/Q3AH-7WV3.
[13] *Id.*
[14] Julie Jargon, *Snapchat's Friend-Ranking Feature Adds to Teen Anxiety,* WALL ST. J. (Mar. 30, 2024), https://perma.cc/VSK6-N97X.

Snapchat for as long as possible, regardless of the consequences for users' mental health and well-being.

\* \* \*

77.     Snap bills Snapchat as unique among its social media platform peers in ways that supposedly make it safer and more authentic. For example, a Snap media campaign touts Snapchat's supposed lack of features that promote social comparison: "Less likes. More love" and "Less social media. More Snapchat."[15] Snap goes so far as to say it "was built as an antidote to social media."[16] Such claims are highly deceptive in light of the manipulative design features of Snapchat that promote behavioral addiction and encourage teens to compare themselves, their relationships, and their social standing to others. Snap also unfairly fails to warn users about these dangerous and psychologically harmful aspects of its product.

## IV.    Snap's False, Deceptive, and Misleading Representations and Omissions about the Dangers of Using Snapchat.

78.     Snap has established its enormous market share among teenage users of social media in part by marketing Snapchat as safe for minor users. Perhaps most notably, Snap assigns itself a "12+" rating in the Apple App Store and a "T for Teen" rating in the Google Play and Microsoft Stores. Consumers are presented with these age ratings when they download Snapchat on a smartphone. These age ratings are highly deceptive—both because of the psychologically harmful features of Snapchat described above and because Snapchat hosts enormous amounts of mature content and facilitates dangerous activities as detailed below.

79.     Apple, Inc. ("Apple") requires developers like Snap who submit an app for inclusion in Apple's App Store to answer an age-rating questionnaire. Apple says that apps that

---

[15] *Less Likes. More Love,* SNAP INC., https://perma.cc/DH8D-CDWT.
[16] *Id.*

host user-generated content (like Snapchat) "should share the age rating of the highest age rated creator content available in the app."[17] Apple warns developers: "We have lots of kids downloading lots of apps," and app developers like Snap "have to do [their] part" to keep kids safe. *Id.* Apple also tells developers to "[a]nswer the age rating questions in App Store Connect honestly so that your app aligns properly with parental controls." *Id.* "If your app is mis-rated," Apple warns, "customers might be surprised by what they get, or it could trigger an inquiry from government regulators." *Id.*

80.    Apple's age-rating questionnaire asks Snap to describe the content available on the Snapchat app in each of these categories: "Alcohol, Tobacco or Drug Use or References," "Sexual Content or Nudity," "Mature/Suggestive Themes," and "Profanity or Crude Humor." Based on the self-selected answers to these questions—"none," "infrequent/mild," or "frequent/intense"—Apple automatically generates an age-rating. Apple also offers every app developer (including Snap) the option to self-select a higher age rating than the one Apple suggests based on the app developer's answers regarding the various categories of content.

81.    Snap self-selects the answer "infrequent/mild" for each of the described categories. By doing so, Snap chooses to make the following representations displayed on its page in the App Store:

"Infrequent/Mild Profanity or Crude Humor"

"Infrequent/Mild Mature/Suggestive Themes"

"Infrequent/Mild Sexual Content and Nudity"

"Infrequent/Mild Alcohol, Tobacco, or Drug Use or References"

---

[17] *App Review Guidelines*, APPLE, https://perma.cc/HA6S-KBD.

82.     Snap's answers cause Apple to offer a "12+" age rating option. Apple defines apps with the "12+" age rating as apps that "may also contain infrequent mild language, frequent or intense cartoon, fantasy, or realistic violence, infrequent or mild mature or suggestive themes, and simulated gambling, which may not be suitable for children under the age of 12." Snap chooses to rate its app "12+."

83.     The next higher (and highest) age rating is "17+." Apple offers Snap the option to choose this rating, but Snap has never done so. Apple defines apps with the "17+" age rating as apps that "may also contain frequent and intense offensive language, frequent and intense cartoon, fantasy, or realistic violence, and frequent and intense mature, horror, and suggestive themes; plus sexual content, nudity, alcohol, tobacco and drugs which may not be suitable for children under the age of 17."

84.     Snap also makes Snapchat available in the Google Play and Microsoft Stores. Snap responds to age-rating questions in a way that allows it to claim a "T for Teen" age rating for Snapchat. Snap knows and intends that Google and Microsoft will convey the "T for Teen" age rating to consumers on Snap's behalf. A "T for Teen" rating is defined as: "Content is generally suitable for ages 13 and up. May contain violence, suggestive themes, crude humor, minimal blood, simulated gambling and/or infrequent use of strong language." By contrast, an "M for Mature" rating is defined as: "Content is generally suitable for ages 17 and up. May contain intense violence, blood and gore, sexual content and/or strong language."

85.     As detailed below, Snap's age rating representations are deceptive and unfair.

## A.  Profanity or Crude Humor

86.     Profanity on Snapchat is neither "infrequent" nor "mild."

87.     Prior to the filing of this lawsuit, an investigator in the Attorney General's Office set up an account on Snapchat on a new iPhone using a 13-year-old's birthday. Using this 13-year-old's account, the investigator found that minors are easily able to access videos containing frequent and intense profanity, including the following examples:

- A video of two women, with one of them giving the middle finger while both are singing along to the lyrics: "Honestly, don't give a fuck 'bout who ain't fond of me, dropped two mixtapes in six months, What bitch working as hard as me?";

- Someone telling a story with lots of profanity: "After that album they did together and shit like that, it was just like all the sudden motherfuckers just felt like … on that pussy shit.";

- Someone in a car holding a bottle of Patron tequila with a straw in it, saying: "Friday. I ain't got no job. Bitch, I'm gonna get fucked up!";

- A man doing smoke tricks while smoking a cigarette with the background lyrics, "Used to love another bitch, now she sucking other dicks, so I cut my fucking wrist feelin like a puddle of piss, suicide death of me, who gives a fuck? No one."

88.     Such content is readily available on Snapchat; yet Snap tells Florida consumers in the App Store that "profanity or crude humor" is "infrequent/mild" on the platform. That is false, deceptive, and misleading.

**B. Alcohol, Tobacco, and Drug Use or References**

89.     Alcohol, tobacco, and drug use or references on Snapchat are neither "infrequent" nor "mild."

90.     The Attorney General's investigation revealed that alcohol, tobacco, and drug use or references appear frequently, are intense, and are visible to minor users on Snapchat. Indeed, while logged in as a 13-year-old user, the Attorney General's investigator saw many advertisements for alcohol and illegal drugs. These are just a few examples:

- Flavored cannabis single-use vape pens, advertised as "Lmkk for tmr" (which is slang for "let me know for tomorrow") and "941 ONLY" (a reference to an area code in southwestern Florida);

- Packs of fruit flavored cannabis products with the text: "Different flavs to get Blazzzed" ("blazed" is slang for a cannabis-induced high);

- Offerings of magic mushroom chocolate bars, cannabis resin, and single-use cannabis vape products, for sale from another user.

91.    Other publicly reported examples confirm that drug content on Snapchat is not "mild" or "infrequent." Numerous young people, including young people in Santa Rosa County, have been exposed to drug dealers on Snapchat offering illicit or regulated drugs for sale.[18] In some cases, Snapchat *recommended* such content to young users. Many young people have died from consuming drugs they purchased from dealers on Snapchat.



93.    Despite the ready availability and severity of drug, alcohol, and tobacco content on Snapchat, Snap tells Florida consumers in the App Store that "alcohol, tobacco, and drug . . . references" are "infrequent/mild" on the platform. That is false, deceptive, and misleading.

## C. Sexual Content and Nudity

94.    Sexual content and nudity on the Snapchat app is neither "infrequent" nor "mild." Despite what Snap tells Florida consumers,

---

[18] *See, e.g.,* Keith Lane, *Pensacola pair arrested after Snapchat drug deal leads to child abuse, kidnapping charges,* NBC NEWS 15 (June 24, 2019), https://perma.cc/QR3X-3FVR (detailing arrests made by Santa Rosa County Sheriff's Office in connection with juvenile drug deal involving youths aged from 12 to 17 that was planned over Snapchat).

95.    The Attorney General's investigation revealed abundant sexual content on Snapchat, including:

- A woman dancing in a strip club for a man, in which her naked genitalia are visible;

- A woman dancing in a strip club for dollar bills, wearing thong underwear;

- A dancer in lingerie and thong underwear dancing in a bar in Orlando;

- Using the SnapMap, the user could look up an adult entertainment venue in Orlando and watch videos taken there, including male performers dancing with sex toys and topless female performers.

96.    Snapchat also has long been referred to as a "sexting" app, where users can send sexually explicit images or videos or other inappropriate sexual content.

97.    Snap's ephemeral design, which quickly deletes users' messages, allows and encourages young people to exchange sexual content.

98.    Snapchat's design enables predators to solicit from, and easily exchange sexual content with, minors on the app. Such incidents have been widely reported, including in Santa Rosa County.[19]

99.    In 2023, 23% of young Snapchat users had already had an online sexual interaction, 13% with someone they thought was 18 or older. Of minors who had an online sexual interaction in 2023, 16% had it on Snapchat—more than any other platform.[20]

100.    Even though sexual content and nudity is readily accessible and exchanged on Snapchat, Snap tells Florida consumers in the App Store that "sexual content and nudity" is "infrequent/mild" on the platform. That is false, deceptive, and misleading.

---

[19] *See* Kristin Kerns, *Pace man arrested for sending nude pics to minor via Snapchat*, ABC NEWS 3 (March 16, 2016), https://perma.cc/9S3P-J6VH.
[20] *Youth Perspectives on Online Safety* at 14, THORN (Aug. 2023), https://perma.cc/LR3E-H5W5.

### D. Mature/Suggestive Themes

101.    "Mature/suggestive themes" include content related to the topics already described as well as other complex themes that are suitable only for adult audiences such as suicide, self-harm, eating disorders, and other dangerous behavior.

102.    "Mature/suggestive themes" on Snapchat are neither "mild" nor "infrequent." Among other examples, the Attorney General's investigation revealed:

- A picture with the text and matching audio saying: "but then I started thinking to myself, why be sad when you can Js be gone";

- A dark selfie video with the text: "If I don't attempt agin, I betray myself, If I do attempt agin, I betray my therapist Attempting is very dear to me: dearer than I?";

- A video of men moving the dead bodies of two women.

103.    Snap takes enforcement actions on only a tiny fraction of content and accounts reported by its users for inappropriate self-harm and suicide content. In the first half of 2024, Snap received a total of 288,956 reports about content or accounts related to "self-harm & suicide" but took action on only 0.1% of those reports.[21] Snap's systems were only able to proactively identify 289 instances of self-harm and suicide content in that same six-month period, *globally*.[22]

104.    Snapchat also encourages dangerous stunts. For example, one former Snapchat feature, its speed filter, encouraged users to snap their driving at dangerous speeds and caused multiple deaths.[23]

105.    Even though posts containing mature themes are readily available on Snapchat, Snap tells Florida consumers in the App Store that "mature/suggestive themes" are "infrequent/mild" on the platform. That is false, deceptive, and misleading.

---

[21] *Transparency Report*, SNAP INC., https://perma.cc/9ZU6-T9Y6.
[22] *Id.*
[23] Bobby Allyn, *Snapchat Ends 'Speed Filter' That Critics Say Encouraged Reckless Driving,* NPR (Jun. 17, 2021), https://perma.cc/H3P4-S2R2.

### E. Additional Snapchat Features That Make Its 12+ and T for Teen Age Ratings Deceptive and Unfair

106.    Other aspects of the Snapchat platform make the platform's age ratings and other claims to being safe for minor users highly deceptive and unfair.

*My AI*

107.    In February 2023, Snap introduced "My AI," a chatbot feature, for Snapchat+ subscribers. In April 2023, Snap made My AI available to all Snapchat users.

108.    Snap claims that "My AI has been programmed to abide by certain guidelines so the information it provides minimizes harm. This includes avoiding responses that are violent, hateful, sexually explicit, or otherwise offensive."[24] These claims are highly misleading.

109.    Snap made My AI available to Snapchat users, including young users, without adequate vetting or safety measures, exposing those users to dangerous adult content and "conversations" with the technology.

110.    According to a *Washington Post* columnist who tested My AI with a 13-year-old account shortly after it was introduced, the chatbot "gave . . . advice on how to mask the smell of alcohol and pot," how to deceive the supposed teen's parents, and "about having sex for the first time with a partner who is 31."[25]

111.    Snap knows that My AI sometimes gives dangerous advice, but it makes this feature available to its youngest users anyway. █████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

---

[24] Geoffrey A. Fowler, *Snapchat Tried to Make a Safe AI. It Chats with Me about Booze and Sex*, WASH. POST (Mar. 14, 2023), https://perma.cc/PP86-GJWY.
[25] *Id.*



112. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████

*"Friend" Adding Features*

113.    Snapchat users can connect with "friends" on Snapchat in multiple ways, including through the "Find Friends" feature (previously called "Quick Add"). Find Friends connects users who may not know each other in the real world, even when users are not seeking those connections.

114.    Find Friends has connected minors with adult strangers seeking to groom, harass, exploit, and even assault them, or to sell them illegal drugs.

115.    Adult strangers can target and connect with young users on Snapchat easily in numerous ways, including through searching and through Snapchat's "Mention" feature. If a user merely "view[s] a Story that has a Snapchatter Mentioned in it, [they] can add that Snapchatter!"[26]

116.    Adults have groomed, harassed, exploited, assaulted, and sold illegal drugs to minors they connected with on Snapchat because of Snapchat's recommendations and friend-adding features. For example, in May 2023, a man from Navarre was sentenced to 20 years in

---

[26] *How to Add Friends on Snapchat*, SNAP INC., https://perma.cc/6496-EXY2.

federal prison for using Snapchat to request and obtain child pornography from seven minor female victims in return for electronic cigarettes, alcohol, and marijuana.[27]

117.    Snap says it has attempted to make it more difficult for predators and drug dealers to find minors on Snapchat. Snap touted these changes and claimed they made Snapchat safe for young users. In this way, Snap sought to give consumers the impression that strangers could not easily target minors on Snapchat, when Snap knew or should have known that was not the case.

118.    In 2022, Snap claimed that it made it "impossible to add users under 18 unless there are a certain number of friends in common."[28] Last year, Snap tried again, saying it would "prevent delivery of a friend request altogether when teens send or receive a friend request from someone they don't have mutual friends with, and that person also has a history of accessing Snapchat in locations often associated with scamming activity."[29] But it is still possible for predatory adults to find minors on Snapchat, and Snap knows that.

*Snap Map*

119.    Snap Map can display users' locations in real time. Predators and drug dealers use this feature of Snapchat to locate minor victims. Young people also can locate drug dealers on Snap Map, where the dealers post their menus and prices, to buy and arrange delivery of illegal drugs.

120.    ███████████████████████████████████████████████████████████

█████████████████, Snap also previously offered Ghost Trails on Snapchat+, its

---

[27] Press Release, U.S. Attorney's Office, *Navarre Man Sentenced to 20 Years in Federal Prison for Child Exploitation Crimes* (May 23, 2023), https://perma.cc/NHA7-EMXK.

[28] Sara Fischer, *Snapchat making it harder for strangers to find users under 18*, AXIOS (Jan. 18, 2022), https://perma.cc/P9W9-ZJHE.

[29] *New Features to Help Protect Our Community*, SNAP INC. (June 25, 2024), https://perma.cc/D3U6-UX3S.

subscription-based service. Ghost Trails showed users their friends' movements for the prior 24-hour period.

121.    Snap tells parents in its Parent's Guide: "By default, location-sharing is off for all Snapchatters. They have the option to decide to share it on the Map with friends—but never with strangers."[30]

122.    This is false, deceptive, and misleading. Young users can and do form connections with adult strangers they have not met in real life through Snapchat because of Snapchat's ill-designed features. Once that happens, it is a simple matter for those strangers to find young people on the Snap Map, and vice versa.

123.    Additionally, when users submit snaps to "Our Story," they are sharing them with the broader community, not just their friends. Those snaps may show up on the Snap Map.

124.    The ease with which strangers can follow and find each other in real time on Snap Map is unfair and dangerous to young people. It is not a feature consistent with Snap's age ratings and other public representations.

*Ephemeral Messaging*

125.    Snapchat's baseline ephemerality, described at greater length above, also deprives law enforcement of critical evidence to pursue charges against ill-meaning adults who prey on young people on and through Snapchat. A drug dealer, for example, can find a teen on Snapchat and sell him or her a lethal fentanyl-laced pill, but when the teen dies and the messages are deleted from Snap's servers, law enforcement has nothing from Snapchat connecting the dealer with the teen's death.

---

[30] *Parent's Guide: Snapchat's Family Center* at 3, SNAP INC. (July 2022), https://perma.cc/L29J-7D36.

126.    Minors use Snapchat for sexting as well as exchanging content featuring underage alcohol and drug use. Predators target young people for sextortion scams, drug deals, and grooming, knowing that Snap will erase from existence the illicit material they exchange. Snapchat's ephemerality gives young people a false sense of security in engaging with other users—even strangers—up to and including feeling less inhibited to seek illicit drugs or share nude images of themselves.

127.    In reality, as Snap knows, methods exist that permit predators to take screen shots or otherwise save in perpetuity "disappearing" content without their targets' knowledge. This content can then be, and is, used to extort young people, pressure and coerce them into sending more explicit material, or illicitly store their images or sell them to pedophiles, among other things. This is a particular problem for Snapchat. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

128.    Snapchat also features a "My Eyes Only" option to keep snaps "extra private!"[31] Snaps saved in My Eyes Only are protected by a passcode, and Snap itself cannot access them. The feature encourages youth to hide problematic snaps from their parents and enables predators to retain illicit content—including child sexual abuse material—away from even Snap itself.

**F.  Snap's Deceptive Claims and Omissions About the Family Center**

129.    In an effort to deflect from the many dangers associated with using Snapchat, Snap has touted parental controls that it makes available in its Family Center. For example, Snap tells parents that the company "take[s] [it]s responsibility to help provide teens on Snapchat extremely seriously" and claims that through the Family Center it "arm[s] parents with tools and resources

---

[31] *How does My Eyes Only work?*, SNAP INC., https://bit.ly/4cJjrqS.

to help their teens use Snapchat safely."[32] Snap also markets the Family Center as a set of "tools and resources to help [parents] support their teens' safe use of Snapchat."[33] Such statements are deceptive and contain material omissions; despite Snap's claims to the contrary, the Family Center fails to provide parents with tools that could be used to mitigate the risks and harms of Snapchat use described above.

130.    Only 0.3% of parents with teens who have Snapchat accounts have set up parental controls through the Family Center. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ Snap has also designed the Family Center parental controls to make them extremely burdensome for parents to use. A parent who wishes to use Family Center parental controls must download the Snapchat app onto his phone, set up his own Snapchat account, and request permission from the child to link the parent's account with the child's account—████████████████████████████████████████████. Once Family Center controls are set up, the parent must remember to regularly check the app to monitor the information provided there, ████████████████████████████████████████

████████████████████████

131.    Even when parents successfully set up and monitor Family Center parental controls, these limited controls fail to protect teens from the myriad dangers of using Snapchat. Family Center functions are largely limited to allowing parents to see who their teen is "friends" with on Snapchat and who they have been communicating with. But this information does not illuminate much, given the sheer number of "friends" teens connect with on Snapchat. The Family Center gives parents no insight into their teens' exposure to harmful or inappropriate material like nude

---

[32] *Tools and Resources for Parents,* SNAP INC., https://perma.cc/6LNR-GDF6.
[33] Snapchat, *Introducing Snapchat's Family Center*, YOUTUBE (Aug. 9, 2022), https://bit.ly/4lKlJu3.

images or drug content, no ability to set privacy controls for their teens, no ability to set time limits for their teens, and no ability to discern when their teens bypass parental controls by, for example, using secondary accounts. Moreover, teens, who are often more familiar with technology than their parents, can easily evade even the limited parental controls that are available in the Family Center.

## V.   Snap's Unfair Practices, Deceptive Statements, and Omissions Cause Substantial Injury to Florida Consumers.

132.   Snap's deceptive statements and omissions and unfair practices cause substantial harm to Florida consumers.

133.   Just as parents might determine which movies are appropriate for their children based on the "rating" a movie receives, parents also check the age rating of apps and associated content descriptors before allowing their children to download and use them. Parents may supervise their children's devices to see which apps their children are downloading or use parental controls to prevent their children from downloading apps with particular age ratings.

134.   Snap's representations and acts are particularly important to parents and other Snapchat users because once a Snapchat user sees harmful content on the app, it cannot be "unseen." Similarly, once a young person experiences a harmful or dangerous feature or interaction, the effects can be long-lasting.

135.   Snap knows that parents care about what their teens will be exposed to on Snapchat. Snap's misrepresentations seek to prevent parents who are unfamiliar with Snapchat's addictive features and the harmful content it hosts from developing such concerns. They seek to convince parents that Snapchat is safe for their teens, so they will download Snapchat and allow their teens to do so.

136.   Consumers, particularly parents, also care whether an app is addictive and could lead to compulsive or otherwise harmful use, particularly where such use immerses young people

in content and interactions that can lead to or worsen mental health concerns, disordered eating, and other harmful conditions and behaviors.

137.    Parents also care about safety and parental-control features and tools. Parents who seek to use these controls expect them to do what Snap says they will do—help them keep their teens safe on Snapchat.

## CAUSES OF ACTION

### COUNT I
### Violation of H.B. 3

138.    All the foregoing paragraphs are incorporated by reference.

139.    Snap is a "social media platform" within the meaning of H.B. 3 and subject to regulation under that statute. § 501.1736(1)(e), Fla. Stat

140.    Snap has openly and admittedly violated H.B. 3's restriction on covered social media companies entering into contracts with children under the age of 14.

141.    Snap has openly and admittedly violated H.B. 3's restriction on social media companies entering into contracts with children aged 14 or 15 without parental consent.

142.    Each knowing violation of H.B. 3 constitutes an unfair and deceptive trade practice under FDUTPA. § 501.1736(5), Fla. Stat.

143.    The Court should enjoin Snap from continuing to violate H.B. 3.

144.    The Court should assess penalties in the amount of up to $50,000 for each violation in accordance with § 501.1736(2)(b)(5), Fla. Stat.

145.    The Court should assess punitive damages for Snap's "failure to comply" and "consistent pattern of knowing or reckless conduct." *Id.*

## COUNT II

### Violation of the Florida Deceptive and Unfair Trade Practices Act

146.    The allegations in paragraphs 1 through 137 are incorporated by reference.

147.    Snap's promotion, marketing, and advertising of Snapchat in the State of Florida involves trade or commerce within the meaning of FDUPA, which states that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." § 501.204, Fla. Stat.

148.    Snap engages in unfair practices that offend public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

149.    Snap's unfair acts include but are not limited to Snap's choice to design Snapchat to include features known to promote compulsive, prolonged, and unhealthy use by children.

150.    Snap's acts and omissions alleged in this Complaint also have caused and continue to cause substantial injury to children and other users of Snapchat that could not be reasonably avoided by consumers and does not result in any countervailing benefit to consumers or competition.

151.    In connection with the advertising, marketing, and promotion of Snapchat, Snap made and continues to make deceptive representations to the public that are likely to mislead consumers acting reasonably under the circumstances. These include, but are not limited to, Snapchat's "12+" and "T for Teen" age ratings, as well as Snap's claims that profanity, sexual content, drug content, and other mature content on the Snapchat platform is "Infrequent/Mild." Snap knew or should have known that the deceptive statements alleged in this Complaint were false.

152.    In connection with the advertising, marketing, and promotion of Snapchat, Snap made and continues to make deceptive omissions to the public that are likely to mislead consumers

acting reasonably under the circumstances. These include, but are not limited to, Snap's failure to disclose the fact that Snapchat is designed to promote behavioral addiction, that it hosts large amounts of sexualized, drug-related, and other mature content, and that it can be easily used to purchase drugs and engage in other dangerous activities.

153.    Snap engages in representations, acts, practices, or omissions that are material and are likely to mislead consumers acting reasonably under the circumstances.

154.    Snap knew or should have known that its conduct was unfair or deceptive.

155.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Snap's violations of FDUTPA. Absent injunctive relief by this Court, Snap is likely to continue to injure consumers and harm the public interest.

**TRIAL BY JURY**

156.    The Attorney General demands a jury trial.

**PRAYER FOR RELIEF**

Wherefore, the Attorney General requests that the Court:

A.    Enter judgment in favor of the Attorney General and against Snap;

B.    Declare that Snap's actions violate H.B. 3 and FDUTPA;

C.    Temporarily and permanently enjoin Snap to prevent future violations of H.B. 3 and FDUTPA;

D.    Award civil penalties and attorney's fees under H.B. 3 as authorized by § 501.1736, Fla. Stat.;

E.    Award punitive damages for Snap's knowing violations of H.B. 3 as authorized by § 501.1736, Fla. Stat.;

F.    Award civil penalties and attorney's fees for Snap's willful violations of FDUTPA

under §§ 501.2075, 501.2077, Fla. Stat.;

G.    Order that Snap pay court costs and all costs associated with distributing and

executing on any restitution or judgment made by this Court, *id.*; and

H.    Grant such other and further legal or equitable relief as justice requires.

Respectfully submitted,

**JAMES UTHMEIER**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

By: */s/ Donna Cecilia Valin*

Donna Cecilia Valin (FL Bar No. 96687)
Special Counsel, Assistant Attorney General
Consumer Protection Division
135 West Central Blvd.
Orlando, FL 32801
(407) 316-4840
Donna.valin@myfloridalegal.com

Nicholas J. Weilhammer (FL Bar No.
479322)
Associate Deputy Attorney General for
Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
(850) 414-3300
Nicholas.weilhammer@myfloridalegal.com

David H. Thompson*
Brian W. Barnes*
Elizabeth Price Foley (FL Bar No. 92380)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
efoley@cooperkirk.com

*Applications for admission
*pro hac vice* forthcoming

Victoria Ann Butler (FL Bar No. 861250)
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
(813) 287-7950
Victoria.butler@myfloridalegal.com

Diane Kondor Oates (FL Bar No. 116233)
Senior Assistant Attorney General
Consumer Protection Division
1 SE 3rd Avenue
Miami, FL 33131
(305) 377-5835
Diane.oates@myfloridalegal.com

*Attorneys for Office of the Attorney General,*
*State of Florida, Department of Legal Affairs*

36

# EXHIBIT B

IN THE CIRCUIT COURT OF
THE FIRST JUDICIAL DISTRICT
IN AND FOR SANTA ROSA COUNTY

CIVIL DIVISION

CASE NO. : 25-000258 CA MXAX

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

    *Plaintiff*,

v.

SNAP INC.,

    *Defendant.*

_____/

SUMMONS

THE STATE OF FLORIDA:

To Each Sheriff of the State:

    YOU ARE COMMANDED to serve this summons and a copy of the complaint or petition in this action on defendant,

Snap Inc.
c/o Corporation Service Company, Registered Agent
1201 HAYS STREET
TALLAHASSEE, FL 32301-2525

    Each defendant is required to serve written defenses to the complaint or petition on Office of the Attorney General, State of Florida, Department of Legal Affairs Special Counsel Donna C. Valin, plaintiff's attorney, whose address is 135 West Central Blvd. Suite 1000, Orlando, FL 32801, within 20 days[1] after service of this summons on that defendant, exclusive of the day of service, and to file the original of the defenses with the clerk of this court either before service on plaintiff's attorney or immediately thereafter. If a defendant fails to do so, a default will be entered against that defendant for the relief demanded in the complaint or petition.

DATED APRIL 23 2025

Jason D. English, Esq.

As Clerk of the Court

By _____

As Deputy Clerk

_____

[i] 1 Except when suit is brought pursuant to section 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to section 768.28, Florida Statutes, the time to be inserted is 30 days.

UNOFFICIAL DOCUMENT

# EXHIBIT C

IN THE CIRCUIT COURT OF
THE FIRST JUDICIAL DISTRICT
IN AND FOR SANTA ROSA COUNTY

CIVIL DIVISION

CASE NO. : 25-000258 CA MXAX

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

    *Plaintiff,*

v.

SNAP INC.,

    *Defendant.*

_____/

## <u>NOTICE OF FINAL SERVICE</u>

    In this matter, Snap Inc., the sole Defendant, has been served with the Complaint. The date of service was April 25, 2025. This case should be designated as complex under Florida Rule of Civil Procedure 1.201. Because counsel for Defendant Snap Inc. has not yet entered an appearance, the Attorney General was unable to confer with Snap about this proposed designation.

Dated: 4/29/2025

                        Respectfully submitted,

                        **JAMES UTHMEIER**
                        **ATTORNEY GENERAL**
                        **STATE OF FLORIDA**

                        By: */s/ Donna Cecilia Valin*

| | |
|---|---|
| Nicholas J. Weilhammer (FL Bar No. 479322) | Donna Cecilia Valin (FL Bar No. 96687) |
| Associate Deputy Attorney General for Enforcement | Special Counsel, Assistant Attorney General Consumer Protection Division |
| PL-01 The Capitol | 135 West Central Blvd. |
| Tallahassee, FL 32399 | Orlando, FL 32801 |
| (850) 414-3300 | (407) 316-4840 |
| Nicholas.weilhammer@myfloridalegal.com | Donna.valin@myfloridalegal.com |
| | Victoria Ann Butler (FL Bar No. 861250) |

David H. Thompson*
Brian W. Barnes*
Elizabeth Price Foley (FL Bar No. 92380)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
efoley@cooperkirk.com

*Applications for admission
*pro hac vice* forthcoming

Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
(813) 287-7950
Victoria.butler@myfloridalegal.com

Diane Kondor Oates (FL Bar No. 116233)
Senior Assistant Attorney General
Consumer Protection Division
1 SE 3rd Avenue
Miami, FL 33131
(305) 377-5835
Diane.oates@myfloridalegal.com

*Attorneys for Office of the Attorney General,
State of Florida, Department of Legal Affairs*

UNOFFICIAL DOCUMENT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 29, 2025, a true and correct copy of the foregoing document was filed through the Florida Courts E-Filing Portal which has simultaneously effected service to all counsel of record and a copy has also been furnished to Snap, Inc. c/o Corporation Service Company, Registered Agent at 1201 Hays Street, Tallahassee, Florida 32301 by U.S. Mail on April 29, 2025.

*/s/ Donna Cecilia Valin*
Donna Cecilia Valin (FL Bar No. 96687)

# EXHIBIT D

*IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT, IN AND FOR SANTA ROSA COUNTY, FLORIDA*

*Office of the Attorney General, State of Florida, Department of Legal Affairs*

*Plaintiff(s)*

VS.                                    *Case No: 25-000258-CA MXAX*

*Snap Inc.*

*Defendant(s)*

### AFFIDAVIT OF SERVICE

*I, Michael C. Nolan, a Private Process Server, being duly sworn, depose and say:*

*That I have been duly authorized to make service of the Summons, Complaint, and Order to Plaintiff Regarding Required Reporting in the above entitled case.*

*That I am over the age of eighteen years and not a party to or otherwise interested in this action.*

*That on 04/25/2025 at 09:15 AM, I served Snap Inc. c/o Corporation Service Company, Registered Agent at 1201 Hays Street, Tallahassee, Florida 32301 with the Summons, Complaint, and Order to Plaintiff Regarding Required Reporting by serving Sheena Black, Agent, authorized to accept service on behalf of Corporation Service Company.*

*Sheena Black is described herein as:*

*Gender:  Female   Ethnicity:  African American   Age:  35+   Weight:  145   Height:  5'6"   Hair:  Red*

*I solemnly affirm under the penalties of perjury that the contents of this document are true to the best of my knowledge, information, and belief.*

Executed on   4/30/25

*Subscribed and sworn to before me by the affiant who is personally known to me.*

_____          _____
                                                                         *Michael C. Nolan*

8/17/25

*Commission Expires*
DEBORAH BROWN
MY COMMISSION EXPIRES
AUGUST 17, 2025
#HH 119650
Bonded thru
Notary Public Underwriters
NOTARY PUBLIC, STATE OF FLORIDA

*Client Ref Number: N/A*
*Job #:13172984*

# EXHIBIT E

IN THE CIRCUIT COURT OF
THE FIRST JUDICIAL DISTRICT
IN AND FOR SANTA ROSA COUNTY

CIVIL DIVISION

CASE NO.: 25-000258 CA MXAX

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

**PUBLIC REDACTED**

 *Plaintiff*,

v.

SNAP INC.,

 *Defendant*.

_____/

## MOTION FOR TEMPORARY INJUNCTION

 The Attorney General moves for a temporary injunction under §§ 501.207 and 501.1736, Florida Statutes, and Rule 1.610 of the Florida Rules of Civil Procedure. Specifically, to prevent continuing harm to Florida's children by ensuring compliance with Florida Statutes Section 501.1736 ("H.B. 3"), the Attorney General requests an order enjoining Defendant Snap Inc., from entering into or continuing any contractual relationship with a child who it knows is aged 13 or younger, or with a child who it knows is 14 or 15 without parental consent, as prohibited by H.B. 3.

## INTRODUCTION

 To maximize its advertising revenue, Snap uses a variety of manipulative design features aimed at coaxing users into spending as much time as possible on the Snapchat social media platform. The use of such design features by Snap and other social media companies has led to widespread behavioral addiction to social media among young people, thereby precipitating a teen

mental health crisis in Florida and throughout the Nation. To address this problem, the Florida Legislature—by broad bipartisan votes—enacted H.B. 3, which limits the ability of covered social media platforms to contract with children if they choose to use these addictive design features.

Snap has admitted that it is subject to H.B. 3, but it is not complying with this important public health measure based on the apparent belief that the law violates the First Amendment. Snap is wrong to think that the First Amendment entitles it to ignore H.B. 3. As state courts in Arkansas, California, the District of Columbia, Massachusetts, Nevada, New Hampshire, Oklahoma, Tennessee, Utah, and Vermont have all recognized, addictive design features like the ones that H.B. 3 regulates are not speech at all and therefore do not enjoy any First Amendment protection. But to the extent that H.B. 3 triggers the First Amendment, it is a content neutral regulation of the manner of speech that easily passes muster under intermediate scrutiny.

Snap is openly violating H.B. 3, and any First Amendment defense Snap could raise is meritless. The Court should therefore enter a temporary injunction compelling Snap to immediately comply with Florida law.

## BACKGROUND

### A.    Children and Social Media

Mounting evidence shows that social media companies deploy features designed to addict users, resulting in significant harm to their mental health—particularly in children. As the U.S. Surgeon General explained in a recent advisory, platforms use features like "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations" that lead to "excessive use and behavioral dysregulation." *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory*, Ex. 1 at 9 (2023) ("*Surgeon General's Advisory*"). Those features "overstimulate the reward center

in the brain" and "trigger pathways comparable to addiction[,]" causing "changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." *Id.*; *accord* Expert Decl. of Prof. Adam Alter ¶¶ 17-20 (Apr. 22, 2025) ("Alter Decl.") attached as Ex. 2. Although the design features can addict anyone, children "are particularly at risk, as their developing brains are more susceptible to the reward-driven mechanisms underlying the[] features." *Id.* ¶ 47.

That makes young people particularly vulnerable to platforms' addictive features. Adolescents average 5 hours per day on social media with nearly half reporting "almost constant[]" online use. Decl. of Jean Twenge, Ph.D ¶ 9 (Apr. 25, 2025) ("Twenge Decl.") attached as Ex. 3; *see also* Alter Decl. ¶ 19. More than a third feel "addicted" to social media and almost 75% report feeling "manipulate[d]" to spend more time on it than they intend. *Surgeon General's Advisory* at 9-10. That manipulation has severe consequences. "[C]ompulsive or uncontrollable use" of social media can cause "sleep problems, attention problems, and feelings of exclusion[,]" all of which put children at risk of "depression, anxiety, and neuroticism." *Surgeon General's Advisory* at 10; *see also* Alter Decl. ¶ 17; Twenge Decl. ¶¶ 29, 30, 41, 47, 59; Decl. of Dr. Lauren Hale ¶¶ 22, 24-26 (Apr. 22, 2025) ("Hale Decl.") attached as Ex. 4. As child social media use proliferated over the last 15 years, adolescent depression rates more than doubled, and associated behaviors like self-harm and suicide "skyrocketed." Twenge Decl. ¶¶ 15-18, 20.

Studies reveal that the correlation is no coincidence: Addictive social media use is a causal factor. Twenge Decl. ¶¶ 30, 34, 47. There is "a causal path from social media use to depression and low well-being." *Id.* ¶ 59. Children who spend at least 3 hours a day on social media double their likelihood of developing anxiety and depression. *Id.* ¶¶ 39-40; *see also Surgeon General's Advisory* at 6. Because addiction to social media has fueled the Nation's "youth mental health

crisis," *Surgeon General's Advisory* at 13; *see* Twenge Decl. ¶ 26, the U.S. Surgeon General has called on policymakers to develop "health and safety standards" for platforms and to adopt "policies that further limit access . . . to social media for all children[.]" *Surgeon General's Advisory* at 15. The Surgeon General has specifically recommended policies that "limit[] the use of features that attempt to maximize time, attention, and engagement[.]" *Id.*

**B.     H.B. 3**

H.B. 3 protects children from platforms with addictive features by regulating the platforms' contracts with children. When a platform transacts with a child to create a personal account, it can target the child with addictive features like "personal interactive metrics," "[p]ush notifications," "[i]nfinite scrolling," and "[a]uto-play video." § 501.1736(1)(e), Fla. Stat. (2024). If a platform chooses to engage in those practices, H.B. 3 limits its ability to "enter[] into a contract" with a child "to become an account holder." *Id.* § 501.1736(2)(a), (3)(a).

H.B. 3 defines the "social media platform[s]" subject to its provisions as those that: (1) allow "users to upload content or view the content or activity of other users"; (2) employ "algorithms that analyze user data or information on users to select content for users"; (3) use an "addictive feature[]," defined as "[i]nfinite scrolling," "[p]ush notifications or alerts," "[a]utoplay," "[l]ive-streaming," or "personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content"; and (4) have at least 10 percent of their "daily active users who are younger than 16 years of age spend on average 2 hours per day or longer" on the platform. *Id.* § 501.1736(1)(e). If a platform satisfies all those criteria, Section 501.1736(2) prohibits it from "entering into a contract with" a child under 14 "to become an account holder." And Section 501.1736(3) requires the platform to obtain parental consent before "entering into a contract" with "a minor who is 14 or

15" "to become an account holder." An "account holder" is anyone with an "account," "profile," or other "unique identifier while using or accessing" the platform. *Id.* § 501.1736(1)(a).

Violations of H.B. 3 are enforceable by the Office of the Attorney General's Department of Legal Affairs, which "may bring an action against such platform for an unfair or deceptive act or practice" under Part II of Section 501, Florida Statutes. § 501.1736(5), Fla. Stat. (2024). This allows the Department to seek civil penalties and, "[i]n addition," the Department may pursue "other remedies under part II" of Section 501, including an injunction under Section 501.207(1)(b).

### C.    Snap Violates H.B. 3

Snap operates the Snapchat social media platform, which is enormously popular among Florida teenagers. *See* Alter Decl. ¶ 13; Hale Decl. ¶ 13. Snapchat includes four of the five design features that the Legislature found to be "addictive" in H.B. 3. First, Snapchat uses infinite scrolling, which eliminates natural stopping cues and can thereby cause users to "spend much more time on their phone than they originally intended." Alter Decl. ¶ 32; *see also id.* ¶¶ 23, 31. ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Ex. 5 ████████

Second, Snap uses push notifications, which "exploit users' natural tendency to seek and attend to environmental feedback, serving as distractors that monopolize attention." *Id.* ¶ 34. It is "almost impossible" for many users to resist push notifications, and research shows that they "can increase levels of inattention and hyperactivity, while simultaneously lowering productivity and psychological wellbeing, mimicking symptoms of ADHD even in individuals without clinical diagnoses." *Id.* ¶ 35. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

Third, Snap uses personal interactive metrics, which activate parts of the brain associated with reward processing by providing a form of instantaneous feedback that has "been identified as a contributor to the development of habitual behavior[.]" *Id.* ¶¶ 25, 39-40. Among other personal interactive metrics, Snapchat shows users "Snapstreaks"—essentially a running tally of the number of consecutive days that two users have sent each other messages. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████ Ex. 6

████████

Fourth, Snapchat automatically plays videos, thereby pushing users to "stay engaged without any further effort." *Id.* ¶ 44. This feature of Snapchat exploits the psychology of behavioral addiction to keep users on the platform for extended periods. *Id.* ¶ 26. Unfortunately for Florida teens, the total sum of Snap's multiple addictive design features is worse than its individual parts: "The combined force of multiple addictive features operating at once ensures that social medial platforms [such as Snapchat] function to continuously siphon users' time and cognitive resources." *Id.* ¶ 48.

Shortly before H.B. 3 was set to take effect on January 1, 2025, a trade association that represents Snap and other social media companies sued the Attorney General in federal court seeking an injunction against enforcement of this law based upon the First Amendment. The trade association moved for a preliminary injunction. At that time, the Attorney General's Office had already been investigating various social media platforms, including Snap, due to concerns that

the platforms are harming children and engaging in unfair and deceptive trade practices, but the Office had not investigated compliance with H.B. 3 since it was not yet in effect. To facilitate a briefing schedule on the preliminary injunction motion that would make it possible to conduct discovery and develop a factual record, the Attorney General agreed to not enforce H.B. 3 until the federal court ruled on the motion. On March 17, 2025, the federal court denied the motion for lack of standing. *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 4:24cv438-MW/MAF, 2025 WL 893402, at *1 (N.D. Fla. Mar. 17, 2025).[1]

After the court denied the motion, the Attorney General's Office broadened its investigations of social media companies to include H.B. 3 compliance, and it determined that Snap is openly violating the law. The company meets all the criteria necessary for it to be subject to regulation under H.B. 3, Decl. of David Boyle ¶¶ 9-15 (Mar. 24, 2025) ("Boyle Decl.") attached as Ex. 7, but it is not complying with the law's requirements. Even when a new user in Florida *tells* Snap as part of the process for signing up for an account that he is 13 years old, Snap proceeds to contract with the user and allows him to create an account. Decl. of James Perkins ¶ 4 (Apr. 30, 2025) ("Perkins Decl.") attached as Ex. 8. Likewise, the Attorney General's investigation revealed that Snap is not seeking parental consent before contracting with and giving accounts to 15-year-old Florida users. *Id.* ¶ 5.

---

[1] The trade association has since filed an amended complaint and a second motion for a preliminary injunction that remains pending as of the time of this filing. But the Attorney General did not agree to further delay enforcement of H.B. 3 during the pendency of the trade association's renewed motion. "Having violated [H.B. 3], rather than awaiting the normal development of its federal lawsuit, [Snap] cannot now be heard to complain that its constitutional contentions are being resolved in a state court." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 929 (1975).

**ARGUMENT**

## I.    THE APPLICABLE LEGAL STANDARD

Ordinarily, a temporary injunction is granted only when the party requesting it establishes: (1) a substantial likelihood of success on the merits—sometimes expressed as a "clear legal right" to relief; (2) an inadequate remedy at law; (3) irreparable harm absent the injunction; and (4) the injunction serves the public interest. *Fla. Dep't of Health v. Florigrown*, *LLC*, 317 So.3d 1101, 1110 (Fla. 2021). However, when the government seeks to enforce its police power using a statute authorizing injunctive relief, it need only demonstrate the first element—i.e., a substantial likelihood of success on the merits. Here, "because section 501.207(1)(b) authorizes the Department [of Legal Affairs] to seek injunctive relief, it d[oes] not have to establish irreparable harm, lack of an adequate remedy at law or public interest." *Storer Commc'ns, Inc. v. State*, 591 So.2d 238, 240 (Fla. 4th DCA 1991); *accord E-Racer Tech, LLC v. Office of Att'y Gen*., 198 So.3d 1107, 1110 (Fla. 4th DCA 2016); *Millenium Commc'ns & Fulfillment, Inc. v. Office of Att'y Gen.*, 761 So.2d 1256, 1260 (Fla. 3d DCA 2000). Instead, the Department's "sole burden [is] . . . to establish that it has a clear legal right to a temporary injunction by demonstrating a substantial likelihood of success on the merits." *Office of Att'y Gen. v. Bilotti,* 267 So.3d 1, 3 (Fla. 4th DCA 2019); *E-Racer Tech*, 198 So.3d at 1110; *Millenium*, 761 So.2d at 1260; *Storer*, 591 So.2d at 240.

## II.    THE STATE HAS A CLEAR LEGAL RIGHT TO RELIEF

When the Attorney General "present[s] evidence that [the defendant] is violating the [law] . . . it would be substantially likely to succeed on the merits in seeking to . . . enjoin [Defendant] from future violations." *Polk Cnty. v. Mitchell*, 931 So.2d 922, 926 (Fla. 2d DCA 2006); *accord Manatee Cnty. v. 1187 Upper James*, *LLC*, 104 So.3d 1118, 1121 (Fla. 2d DCA 2012) (defendant's "continuing violation of a known ordinance gives the County a clear legal right to the issuance of

the injunction"). Here, as elaborated below, the Attorney General has ample evidence that Snap is violating H.B. 3.

A.    **Snapchat Is Openly Violating H.B. 3.**

Snap has admitted under oath in other litigation that it satisfies the elements necessary to qualify as a "social media platform" subject to H.B. 3. Snap's Senior Director of Product Management, David Boyle, testified that Snapchat is an application that allows users to upload and view the content of others, as required by § 501.1736(1)(e)-1, Fla Stat. (2024); Boyle Decl. ¶ 10; Boyle Dep. Tr. at 119:2-13 (Dec. 12, 2024) attached as Ex. 9. He also testified that Snapchat uses algorithms to select content for users, as required by § 501.1736(1)(e)-3, Fla. Stat. (2024); Boyle Decl. ¶ 12, that "Snapchat's users include minors in Florida who are 13-16 years old[,]" *id*. ¶ 15, and that "[d]uring the past 12 months, 10% or more of the daily active users on Snapchat who used Snapchat at least 80 percent of the days during the previous 12 months and who are younger than 16 years of age spent on average 2 hours per day or longer on Snapchat on the days when using Snapchat." *Id*. ¶ 11. Mr. Boyle also affirmed that Snapchat "includes at least one [addictive] feature that meets the requirements" of § 501.1736(1)(e)-4, Fla. Stat. (2024); Boyle Decl. ¶ 13. Indeed, Snapchat uses *four* such features: infinite scrolling of videos, displaying personal interactive metrics, push notifications, and video autoplay. *See* Alter Decl. ¶ 10.c; Perkins Decl. ¶ 6.

Despite being aware of H.B. 3 and admitting in other litigation that it is subject to this law, Snap is flagrantly violating its requirements. On April 17, an investigator in the Attorney General's office was able to sign up for a Snap account using a new iPhone in Florida by giving Snap the birthday of a 13-year-old. Perkins Decl. ¶¶ 3-4. He was also able to sign up for a Snap account using the birthday of a 15-year-old without being required to provide parental consent. *Id.* ¶ 5.

Snap is knowingly and willfully failing to comply with H.B. 3, and the Court should enter an injunction requiring it to obey Florida law.

**B.    H.B. 3 Does Not Violate the First Amendment.**

Echoing the legal arguments of its trade association in the federal lawsuit challenging H.B. 3, Snap will undoubtedly argue that the First Amendment gives it a constitutional right to ignore this important public health measure. But any First Amendment defense that Snap raises must fail for two independent reasons. First, H.B. 3 does not implicate the First Amendment because it regulates only the non-expressive, commercial aspects of Snap's business. Second, assuming for sake of argument that H.B. 3 regulates speech, it is a content neutral regulation of the manner of speech that readily satisfies intermediate scrutiny.

**1.    H.B. 3 Does Not Implicate the First Amendment Because It Regulates Snap's Non-Expressive Commercial Conduct, Not Speech.**

H.B. 3 prohibits platforms that use addictive design features from "entering into a contract" with a child "to become an account holder." § 501.1736(2)(a), (3)(a), Fla. Stat. (2024). Any First Amendment challenge to that limitation on platforms' commercial activity must fail because the addictive design features the statute regulates are not sufficiently expressive to trigger First Amendment protection.

Snap is one of several social media companies that are currently facing an avalanche of lawsuits across the country for unfairly designing their products to promote compulsive use among young people. The courts in these cases have overwhelmingly rejected First Amendment defenses at the threshold, concluding that "addictive design features"—including the specific features that H.B. 3 regulates—"are not even speech." *Utah Div. of Consumer Prot. v. Meta Platforms, Inc.*, No. 230908060, 2024 WL 3741422, at *5 (Utah. Dist. Ct. July 18, 2024). State courts in Arkansas, California, the District of Columbia, Massachusetts, Nevada, New Hampshire, Oklahoma,

Tennessee, Utah, and Vermont have all agreed on this point.[2] Similarly, a federal district court hearing a First Amendment challenge to a California law that regulates addictive design features recently concluded that Snap's trade association failed to establish that "continuous scroll, autoplay, and other design features that organize content . . . involve protected editorial judgment or other expressive activity." *NetChoice, LLC v. Bonta*, No. 22-cv-08861-BLF, 2025 WL 807961, at *20 (N.D. Cal. Mar. 13, 2025) (cleaned up).

The many recent decisions that hold that the First Amendment does not protect social media platforms' addictive design features are correct. The U.S. Supreme Court has "extended First Amendment protection only to conduct that is *inherently* expressive," in the sense that a reasonable observer of the conduct would necessarily conclude that it was meant to express some message. *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 65–66 (2006) (cleaned up) (emphasis added); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 745 (2024) (Barrett, J., concurring) (a function of a social media platform "qualifies for First Amendment protection only if it is inherently expressive"). Under that standard, H.B. 3 does not trigger the First Amendment as applied to Snap. In designing its platform to present an infinite and uninterrupted list of videos, for example, Snap is not conveying any message; instead, this feature of Snapchat merely seeks to exploit the psychology of behavioral addiction to keep people on the platform for as long as possible without regard to what they see there. *See* Alter Decl. ¶¶ 31-33. In short, Snapchat's addictive design

---

[2] *See Arkansas v. Meta Platforms, Inc.*, No. 57CV-23-47, 2024 WL 4037209, at *3 (Ark. Cir. Ct. June 13, 2024); *In re Social Media Cases*, Nos. JCCP 5255, 22STCV21355, 2023 WL 6847378, at *38 (Cal. Super. Ct. Oct. 13, 2023); *District of Columbia v. Meta Platforms, Inc.*, No. 2023-CAB-6550, 2023 WL 11921682, at *13 (D.C. Super. Ct. 2023); *Commonwealth v. Meta Platforms, Inc.*, No. 23-2397-BLS1, 2024 WL 4648435, at *9 (Mass. Sup. Ct. Oct. 17, 2024); Opinion at 6, *Nevada v. Snap, Inc.*, No. A-24-886113-C (Nev. Dist. Ct. Feb. 23, 2025) attached as Ex. 10; Order at 27-28, *State of New Hampshire v. Meta Platforms, Inc.*, No. 217-2023-cv-00594 (N.H. Super. Ct. Dec. 10, 2024) attached as Ex. 11; Order at 7, *Oklahoma v. Meta Platforms, Inc.*, No. CJ-2023-180 (Okla. Dist. Ct. Nov. 20, 2024) attached as Ex. 12; *State v. Meta Platforms, Inc.*, No. 23-1364-IV, 2024 WL 3253106, at *12 (Tenn. Ch. Ct. March 13, 2024); *Utah Div. of Consumer Prot.*, 2024 WL 3741422, at *5; *State of Vermont v. Meta Platforms, Inc.*, No. 23-CV-4453, 2024 WL 3741424, at *6 (Vt. Sup. Ct. July 29, 2024).

features are not "sufficiently imbued with the elements of" expression to implicate the First Amendment. *Spence v. Washington*, 418 U.S. 405, 409-10 (1974).

Moreover, even if it were possible "to find some kernel of expression" in Snapchat's addictive design features, "such a kernel is not sufficient to bring [those features] within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989). On Snapchat, infinite scrolling, push notifications, interactive metrics, and autoplay of videos all serve the "dominant non-expressive purpose" of maximizing user time on the platform by promoting compulsive use. *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 95 (2d Cir. 2006). Product designs only enjoy First Amendment protection if their *predominant* purpose is to communicate a message, and Snapchat's addictive design features do not come close to satisfying that standard. *Cf. Burns v. Town of Palm Beach*, 999 F.3d 1317, 1322 (11th Cir. 2021) (no First Amendment right to construct beachfront mansion in architectural style that deviates from local zoning ordinances).

It is no answer to say that *other* aspects of Snap's business may be sufficiently expressive to trigger the First Amendment. As the U.S. Supreme Court recently explained in a case about the First Amendment rights of social media companies, "an entity engaged in expressive activity when performing one function may not be when carrying out another." *Moody*, 603 U.S. at 732 n.4. It has long been settled that the First Amendment is not offended by laws regulating the non-expressive aspects of commerce, even when applied to a business whose core activities are expressive. For example, in *Arcara v. Cloud Books, Inc*., the Supreme Court upheld the closure of an adult bookstore under a public nuisance statute that prohibited facilitating prostitution. 478 U.S. 697, 698, 706 (1986). Heightened First Amendment scrutiny was not required even though the law's enforcement had the "inevitable effect" of closing a bookstore that engaged in such non-

expressive activities. *Id*. at 706. "[T]he First Amendment is not implicated by the enforcement of a public health regulation" just because it happens to affect a bookseller. *Id*. at 707.

The U.S. Court of Appeals for the Eleventh Circuit used the same line of reasoning to uphold the constitutionality of an ordinance prohibiting admittance of minors to establishments serving alcohol as applied to a bar that hosted a political rally. *Indigo Room, Inc. v. City of Fort Meyers*, 710 F.3d 1294, 1299 (11th Cir. 2013). The ordinance at issue in that case "d[id] not reach constitutionally protected conduct" because it simply "d[id] not regulate speech." *Id*. at 1299, 1300. Even though the minor entered the bar to participate in a political rally—the most protected form of expressive activity under the First Amendment—the Eleventh Circuit concluded that the ordinance "does not infringe on Appellants' speech in the first instance." *Id*. at 1300; *accord Gary v. City of Warner Robins*, 311 F.3d 1334, 1336 (11th Cir. 2002). Likewise here, Snap cannot use other, allegedly expressive aspects of its business to shield its non-expressive conduct from regulation.

Finally, history and tradition confirm that H.B. 3 does not implicate the First Amendment. *See Vidal v. Elster*, 602 U.S. 286, 301 (2024) ("[W]hen considering the scope of the First Amendment," the Supreme Court looks to "history and tradition[.]"). At the Founding, children lacked the formal capacity to participate in public life; they were deemed unable "to take care of themselves," 2 James Kent, Commentaries on American Law 101 (1827), and viewed as "lack[ing] reason and decisionmaking ability," *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 826 (2011) (Thomas, J., dissenting); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 272-73 (2011). The common law traditionally prohibited "[e]ntertaining . . . [c]hildren" without parental consent. Juries verdict agst Alice Thomas, Vol. 29: Records of Suffolk Cnty. Ct. 1671-1680 Part 1 at pp. 82-83, https://perma.cc/89UP-YJP6; *see also* Colonial Laws of Mass. Reprinted from the Edition

of 1660, with the Supplements to 1672 137 (1672) (penalizing "entertain[ing]" children "to the dishonour of God and grief of their parents"). The common law also generally limited the ability of children to enter into contracts. *See Lee v. Thompson*, 168 So. 848, 850 (Fla. 1936).

By regulating the ability of Snap and other social media companies with addictive design features to contract with Florida minors, H.B. 3 fits comfortably within this tradition. It prevents platforms with addictive features from contracting with children who lack the capacity to adequately weigh the transaction's risks and benefits. When a platform "enter[s] into a contract" with a child "to become an account holder," there is an exchange of value. § 501.1736(2)(a), (3)(a), Fla. Stat. (2024). The child permits the platform to collect his valuable personal data, advertise to him, and license the content that he generates, and in exchange, the platform gives the child access to its services. *See How Websites and Apps Collect and Use Your Information*, FED. TRADE COMM'N (Sept. 2023), https://perma.cc/5HNZ-BJJQ. The First Amendment does not prohibit the Legislature from regulating such contracts.

\* \* \*

"[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct," and "the First Amendment does not prevent" the latter. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Because H.B. 3 regulates only non-expressive, economic aspects of Snap's business, it is a constitutional exercise of the legislature's broad authority "to adopt statutory regulations for the protection of the health, safety, morals and general welfare of the public." *Haire v. Fla. Dep't of Agric. & Consumer Servs.*, 870 So.2d 774, 782 (Fla. 2004). The First Amendment is not implicated by such laws.

14

**2. To the Extent H.B. 3 Regulates Expression, It Is a Content-Neutral Regulation of the Manner of Expression That Satisfies Intermediate Scrutiny.**

If H.B. 3 triggers the First Amendment at all, it is a content-neutral regulation of the manner of expression that is subject to intermediate scrutiny. States have "latitude" to "design regulatory solutions t[hat] address content-neutral interests," *TikTok Inc. v. Garland*, 145 S. Ct. 57, 71 (2025), and regulations of the time, place, or manner of speech are constitutional so long as they "are narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Clark v. Cmty. For Creative Non-Violence*, 468 U.S. 288, 293 (1984). In the intermediate scrutiny context, a law is narrowly tailored "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (cleaned up). H.B. 3 easily satisfies that standard.

*i.     H.B. 3 Is Content Neutral and Therefore Subject to No More Than Intermediate Scrutiny.*

A law is content-based and subject to strict scrutiny only if it " 'target[s] speech based on its communicative content,' " i.e., "the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. Of Austin, LLC*, 596 U.S. 61, 69 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). H.B. 3 does not discriminate against any topics, ideas, or messages; it protects children from the health risks posed by platforms that use features designed to addict them, regardless of the content on those platforms. H.B. 3's content neutrality is confirmed by the fact that Snap "cannot avoid or mitigate" the effects of the law by altering its speech. *Turner Broad. Sys., Inc. v. FCC*, 512 US. 622, 644 (1994) ("*Turner I*"). Snap could replace all the pornography and advertisements for illegal drugs on its platform with educational videos by Bill Nye the Science Guy, and it would still be subject to H.B. 3 because it is a social media platform that uses addictive design features to promote compulsive use by young people.

In other litigation, Snap's trade association has argued that the criteria that trigger regulation under H.B. 3 are content-based, but that is not so. To the extent that personal interactive metrics, push notifications, infinite scrolling, and autoplay video have any expressive quality at all, these are characteristics of the *manner* in which Snap conveys speech that have nothing to do with "the topic discussed or the idea or message expressed." *City of Austin*, 596 U.S. at 69. Snap can (and does) use these features to promote behavioral addiction without regard to the subject matter of the posts on its platform. The same is true for the other criteria that Snap must satisfy to be subject to regulation under H.B. 3. Snapchat is covered by this law because at least 10 percent of its daily active users who are under 16 years old spend at least 2 hours per day on the platform, § 501.1736(1)(e)(2), Fla. Stat. (2024); it makes no difference to the application of that statutory provision whether the teens spending so much time on Snapchat are scrolling through photos of OnlyFans models or watching cat videos. Likewise with respect to Snap's use of algorithms that analyze user data and the fact that it allows users to upload and view each other's content, § 501.1736(e)(1), (3), Fla. Stat. (2024); these aspects of the statute's definition of a covered "[s]ocial media platform" are completely agnostic as to the subject matter of the speech on Snapchat.

Nor does H.B. 3 have a "content-based purpose or justification." *City of Austin*, 596 U.S. at 69. Snapchat and other social media platforms covered by H.B. 3 use design features that capitalize on the psychology of behavioral addiction to cause young people to spend more time than they intend on social media. Alter Decl. ¶¶ 20, 26, 32. Heavy social media use crowds out time with family, physical activity, and sleep, thereby causing a host of mental health problems in young people and harming their long-term cognitive development. Twenge Decl. ¶¶ 20-21, 26, 29, 59; Hale Decl. ¶¶ 8-9, 14-17, 22. None of this has anything to do with the content of the speech on

Snapchat or the opinions expressed there. Little wonder that H.B. 3 passed with support from massive bipartisan supermajorities of both houses of the Legislature; this law is about protecting the physical and mental health of teenagers, not political ideology or viewpoint.

The fact that H.B. 3 applies to *all* social media platforms without regard to the subject matter of the speech they host is an important way in which this law differs from statutes enacted in other states that a handful of federal district courts have recently struck down. *See, e.g.*, *NetChoice, LLC v. Yost*, No. 2:24-cv-00047, 2025 WL 1137485, at *20 (S.D. Ohio 2025) (applying strict scrutiny to Ohio law that included exemptions for websites that host product reviews and certain websites with information about news and current events); *NetChoice, LLC v. Griffin*, No. 23-5105, 2025 WL 978607, at *9 (W.D. Ark. March 31, 2025) (applying strict scrutiny to Arkansas law that exempted social media platforms that predominantly feature "news, sports, entertainment," "academic or scholarly research," and "educational" programming); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1032 (S.D. Tex. 2024) (applying strict scrutiny to Texas law that exempted social media platforms that "function[] to provide a user with access to news, sports [or] commerce"). Those cases are readily distinguished from this one because H.B. 3 makes no similar subject-matter-based distinctions among the entities it covers.

Finally, to the extent that the Court has any doubts about whether H.B. 3 is content neutral, it should be mindful of the Supreme Court's rationale for subjecting content-based laws to strict scrutiny. "[C]ontent discrimination" triggers strict scrutiny because it threatens to "drive certain ideas or viewpoints from the marketplace." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 387 (1992) (cleaned up). There is no plausible argument that the marketplace of ideas will be affected if Snap is required to abandon manipulative design features like infinite scrolling and push notifications

17

when it contracts with young teenagers. At most, this is a regulation of the *manner* in which Snap

presents speech to its users, not one that threatens to disrupt the robust exchange of ideas online.

    ii.    *H.B. 3 Advances the State's Compelling Interest in Protecting the Well-Being of Minors.*

H.B. 3 serves the compelling governmental interest of "protecting the physical and

psychological well-being of minors." *Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989); *see also*

*State v. J.P.*, 907 So.2d 1101, 1116-17 (Fla. 2004) (protecting juveniles is a compelling

governmental interest). Adolescents almost universally use social media and are particularly

susceptible to compulsive use that resembles addiction to drugs and gambling. Alter Decl. ¶¶ 10.B,

17-18, 47. That in turn has disastrous consequences for their sleep, mental health, and overall

wellbeing. Twenge Decl. ¶¶ 6, 20, 26, 29, 59; Hale Decl. ¶¶ 14-17, 22, 24-26. The Legislature

relied heavily on that evidence in enacting H.B. 3. *See, e.g.*, Fla. H.R., Staff Final Bill Analysis,

H.B. 3, at 2-7 (Mar. 28, 2024). H.B. 3 thus serves an interest that is not merely significant but

*compelling* under the precedents of both the United States and Florida Supreme Courts. *Sable*

*Commc'ns*, 492 U.S. at 126; *J.P.*, 907 So.2d at 1117.

    iii.    *The State's Purpose of Protecting Minors Would Be Achieved Less Effectively Absent H.B. 3.*

When a law is content neutral, "it need not be the least restrictive or least intrusive means

of" furthering the government's interests. *Ward*, 491 U.S. at 798. So long as the government's

interest "would be achieved less effectively absent regulation," it must be upheld. *TikTok*, 145

S. Ct. at 70 (cleaned up); *Ward*, 491 U.S. at 799; *Frandsen v. Dep't of Env't Prot.*, 829 So.2d 267,

270 (Fla. 1st DCA 2002). This is a forgiving standard that requires the Court to defer to the

Legislature's policy judgments: "[t]he validity of time, place, or manner regulations does not turn

on a judge's agreement with the responsible decisionmaker concerning the most appropriate

method for promoting significant government interests or the degree to which those interests

should be promoted." *Ward*, 491 U.S. at 800 (cleaned up). The Court is also required to accord "substantial deference to the predictive judgments of [the Legislature]," for "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *TikTok*, 145 S. Ct. at 69-70 (cleaned up).

H.B. 3 satisfies this standard with ease. Without H.B. 3, the State's goal of protecting children from the harms of compulsive use of social media would be achieved less effectively. Indeed, this goal could not be achieved effectively at all. The evidence amply shows that H.B. 3 is substantially related to the State's goal in four ways. First, H.B. 3 applies only to those social media platforms that contract with users under age 16. § 501.1736(2)-(3), Fla. Stat. (2024). "Social media is more strongly linked to negative outcomes among children and younger teens compared to older teens." Twenge Decl. ¶ 48. The younger the child, the more vulnerable they are to the harms wrought by social media. *Id.* ¶¶ 51, 55, 58; Alter Decl. ¶ 47; *see also Surgeon General's Advisory* at 7 ("If such sizeable effects occurred in college-aged youth, these findings raise serious concerns about the risk of harm from social media exposure for children and adolescents who are at a more vulnerable stage of brain development."). The evidence of harm is "more pronounced . . . on the mental health of those under 15 compared to those 16 and older." Twenge Decl. ¶ 51; *see also id.* ¶ 58; Alter Decl. ¶ 47. In short, "the research literature on social media use and mental health supports the prohibition of anyone under age 14 from having an account and requiring 14- and 15-year olds to obtain parental consent to become an account holder, as required by Fla. Stat. 501.1736 (HB3)." Twenge Decl. ¶ 59.

Second, HB3 allows slightly older teens, age 14 or 15, to enter into a contract with a social media platform if her parent or guardian consents. § 501.1736(3), Fla. Stat. (2024). Evidence

shows that older children are less vulnerable than younger ones. Twenge Decl. ¶¶ 51, 55, 57; Alter Decl. ¶ 47. By allowing 14- and 15-year-olds to be account holders with parental consent, H.B. 3 tailors its most stringent application to children who face the most significant risk of harm.

Third, H.B. 3 applies only to social media platforms with at least 10 percent of daily active users who are under 16 who spend an average of two hours per day or longer on the platform. § 501.1736(1)(e)(2), Fla. Stat. (2024). The evidence overwhelmingly shows that more than two hours per day of social media use is harmful to children. Twenge Decl. ¶¶ 39-41. There is a strong correlation between mental health problems and the time adolescents spend on social media. *Id*. ¶ 38 fig. 8, *id*. ¶ 40. Thus, "the correlative evidence consistently demonstrates that the more time a child or teen spends on social media, the more likely it is that they will be depressed, have low well-being, or be unhappy." *Id*. ¶ 41. Moreover, research indicates that increased social media time is not merely correlated with but *causes* mental health issues. *Id*. ¶¶ 42-47.

Fourth, H.B. 3 only applies to social media platforms that employ one or more of five addictive features that promote compulsive use of social media. *See* Alter Decl. ¶ 10.c; *Surgeon General's Advisory* at 9. Because H.B. 3 is tailored in these four significant ways, it is substantially related to the State's goal of protecting the health and safety of children.

In other litigation, Snap's trade association has argued that H.B. 3 is not sufficiently tailored because the Legislature could achieve its objectives in less restrictive ways, such as letting parents protect their children using parental controls. That, however, "ignore[s] the 'latitude' [courts] afford the Government to design regulatory solutions to address content-neutral interests." *TikTok*, 145 S. Ct. at 71. The Legislature "could reasonably have determined that" any proposal to simply trust platforms to provide parental controls is not as "effective[]" as H.B. 3 in preventing addiction. *Ward*, 491 U.S. at 801.

The Legislature considered and rejected the adequacy of parental controls, finding them in some cases to even be counterproductive. *See* Fla. H.R., Staff Final Bill Analysis, H.B. 3, at 6-7 (Mar. 28, 2024). The parental controls that Snap makes available in its Family Center underscore why the Legislature was correct in its judgment. Because Snap has done little to promote the Family Center and designed the tools available there to be cumbersome to set up and monitor, less than one percent of parents whose teens have Snapchat accounts use the Family Center. Alter Decl. ¶ 52. What is more, the parental controls in the Family Center do not even address the features of Snapchat that make the platform addictive and cause it to interfere with young users' sleep. Alter Decl. ¶ 51; Hale Decl. ¶ 26. As the present teen mental health crisis underscores, simply trusting Snap to provide parents with the tools they need to address this problem without regulation has not worked.

## III.  EVEN THOUGH IT IS NOT REQUIRED, THE STATE HAS SATISFIED THE OTHER INJUNCTION ELEMENTS

Notwithstanding that the Attorney General is only required to show a clear legal right to obtain a temporary injunction, the facts set forth above establish irreparable harm, the absence of an adequate remedy at law, and that a temporary injunction is in the public interest.

First, the government suffers irreparable harm when it cannot enforce its law. *1187 Upper James*, 104 So.3d at 1121 ("Essentially, the 'irreparable harm' is the government's inability to enforce" its law); *Harvey v. Wittenberg*, 384 So.2d 940, 941 (Fla. 3d DCA 1980). Snap's ongoing violation of a Florida law designed to protect children from behavioral addiction clearly constitutions irreparable harm.

Second, a remedy at law would be inadequate here. A money judgment will not stop the conduct of Snap or protect young Floridians from Snap's illegal conduct. Only an injunction can do that. Finally, granting the requested injunction is clearly in the public interest because "an

injunction merely requiring compliance with binding laws cannot be said . . . to be a disservice to the public." *1187 Upper James*, 104 So.3d at 1121 (quoting *Mitchell*, 931 So.2d at 926). Where a statute prohibits certain activity, an injunction seeking to restrain such activity is in the public interest. *See, e.g.*, *Dispoto v. Marion Cnty.*, 969 So.2d 423, 425 (Fla. 1st DCA 2007); *Ware v. Polk Cnty.*, 918 So.2d 977, 980 (Fla. 2d DCA 2005); *P.M. Realty & Inv., Inc. v. City of Tampa*, 779 So.2d 404, 406-07 (Fla. 2d DCA 2000). The public's interest in preventing continuing violations of its law far outweighs any private interest Snap may have in continuing to perpetuate that harm.

## CONCLUSION

As demonstrated above, the Attorney General has shown a substantial likelihood of success on the merits in establishing that Snap is violating H.B. 3 and that H.B. 3 is consistent with the First Amendment. Accordingly, this Court should issue a temporary injunction enjoining Snap from entering into or continuing any contractual relationship with a child who it knows is 13 or younger, or with a child who it knows is 14 or 15 without parental consent.

Dated this 1st day of May 2025.

Respectfully submitted,

**JAMES UTHMEIER**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

By: */s/ Donna Cecilia Valin*

Nicholas J. Weilhammer (FL Bar No. 4793222)
Associate Deputy Attorney General for Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
(850) 414-3300
Nicholas.weilhammer@myfloridalegal.com

Donna Cecilia Valin (FL Bar No. 96687)
Special Counsel, Assistant Attorney General
Consumer Protection Division
135 West Central Blvd.
Orlando, FL 32801
(407) 316-4840
Donna.valin@myfloridalegal.com

David H. Thompson*
Brian W. Barnes*
Elizabeth Price Foley (FL Bar No. 92380)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
efoley@cooperkirk.com

*Applications for admission
*pro hac vice* forthcoming

Victoria Ann Butler (FL Bar No. 861250)
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
(813) 287-7950
Victoria.butler@myfloridalegal.com

Diane Kondor Oates (FL Bar No. 116233)
Senior Assistant Attorney General
Consumer Protection Division
1 SE 3rd Avenue
Miami, FL 33131
(305) 377-5835
Diane.oates@myfloridalegal.com

*Attorneys for Office of the Attorney General,*
*State of Florida, Department of Legal Affairs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 1, 2025, a true and correct copy of the foregoing document was filed through the Florida Courts E-Filing Portal which has simultaneously effected service to all counsel of record and a copy has also been furnished to Snap, Inc. c/o Corporation Service Company, Registered Agent at 1201 Hays Street, Tallahassee, Florida 32301 by U.S. Mail on May 1, 2025.


*/s/ Donna Cecilia Valin*
Donna Cecilia Valin (FL Bar No. 96687)

**PLACEHOLDER FOR**
**EXHIBIT 1 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 2 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 3 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 4 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR**
**EXHIBIT 5 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 6 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 7 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 8 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 9 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 10 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 11 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**

**PLACEHOLDER FOR
EXHIBIT 12 TO MOTION FOR TEMPORARY INJUNCTION**

**FILED UNDER SEAL IN STATE COURT**