## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA, DEPARTMENT OF
LEGAL AFFAIRS,

     *Plaintiff*,

v.

SNAP, INC.,

     *Defendant*.

Case No. 3:25-cv-676-TKW-HTC

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO REMAND</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................ii

FACTUAL BACKGROUND .................................................................................5

LEGAL STANDARD ..........................................................................................10

ARGUMENT .......................................................................................................11

I.     Snap Has Failed to Establish Federal Diversity Jurisdiction in this Suit by the State's Office of Attorney General. ...................................................11

II.    Snap, A Private For-Profit Company with Negligible, Unrelated, and Unsupported Contacts with the Federal Government, Has Failed to Establish Federal Officer Jurisdiction.......................................................22

       A. Snap Has Failed to Establish that it Acted Under a Federal Officer.................................................................................................23

       B. Snap Has Failed to Establish that it Committed the Acts Alleged in the Attorney General's Enforcement Action Under Color of Federal Office. ...............................................................................................29

III.   The Court Should Award Fees and Costs. ............................................30

CONCLUSION ...................................................................................................32

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Arkansas ex rel. Griffin v. TikTok Inc.*,
    No. 1:23-CV-01038, 2023 WL 4744903 (W.D. Ark. July 25, 2023) .....14, 21

*AU Optronics Corp. v. South Carolina*,
    699 F.3d 385 (4th Cir. 2012) .................................................................. 14, 15

*Bauknight v. Monroe Cnty., Fla.*,
    446 F.3d 1327 (11th Cir. 2006) .............................................................. 30, 31

*Burns v. Windsor Ins. Co.*,
    31 F.3d 1092 (11th Cir. 1994) ................................................................ 10, 11

*California v. TikTok, Inc.*,
    No. 4:24-CV-07942-YGR, 2025 WL 683730 (N.D. Cal. Jan. 28, 2025) .....21

*Cameron v. Hodges*,
    127 U.S. 322 (1888) ......................................................................................11

*Caver v. Cent. Ala. Elec. Coop.*,
    845 F.3d 1135 (11th Cir. 2017) ........................2, 3, 22, 23, 24, 25, 26, 27, 28

*Department of Fair Employment and Housing v. Lucent Technologies*,
    642 F.3d 728 (9th Cir. 2011) .................................................................. 18, 19

*Florida v. Memberworks, Inc.*,
    No. 8:03-CV-2267-T-26TGW, 2003 WL 27374081
    (M.D. Fla. Dec. 23, 2003) .............................................................................17

*Florida v. Exxon Mobil Corp.*,
    No. 4:10CV21-RH/WCS, 2010 WL 11579390 (N.D. Fla. Apr. 16, 2010) ..18

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*,
    463 U.S. 1 (1983) ...........................................................................................4

*Gunter v. AGO Int'l B.V.*,
    533 F. Supp. 86 (N.D. Fla. 1981) ........................................................... 17, 18

*Harvey v. Blockbuster, Inc.*,
    384 F. Supp. 2d 749 (D. N.J. 2005) ..............................................................16

*Hood v. AstraZeneca Pharms., LP*,
    744 F. Supp. 2d 590 (N.D. Miss. 2010) .......................................................16

*Illinois ex. rel. Scott v. Hunt Int'l Res. Corp.*,
    481 F. Supp. 71 (N.D. Ill. 1979) ...................................................................16

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
    354 F. Supp. 3d 1122 (N.D. Cal. 2019) ....................................................4, 16

*Indiana v. TikTok, Inc.*,
    No. 1:23-cv-13-HAB, 2023 WL 3596360 (N.D. Ind. May 23, 2023) ..........21

*Jordan v. Closet Factory Franchise Corp.*,
    No. 24-12229, 2025 WL 1100911 (11th Cir. Apr. 14, 2025) .......................15

*Kansas ex rel. Stovall v. Home Cable*,
    35 F. Supp. 2d 783 (D. Kan. 1998) ........................................................16, 17

*LG Display Co. v. Madigan*,
    665 F.3d 768 (7th Cir. 2011)..........................................................15, 20, 21

*Martin v. Franklin Cap. Corp.*,
    546 U.S. 132 (2005)....................................................................30, 31, 32

*Meadows v. Georgia*,
    145 S. Ct. 545 (2024) ...........................................................................11

*Nevada v. Bank of Am. Corp.*,
    672 F.3d 661 (9th Cir. 2012)...........................................................15, 16, 19

*Newman-Green, Inc. v. Alfonzo-Larrain*,
    490 U.S. 826 (1989) .........................................................................11, 12

*Ohio v. GMAC Mortg., LLC*,
    760 F. Supp. 2d 741 (N.D. Ohio 2011).................................................19, 20

*Robertson v. Jordan River Lumber Co.*,
    269 F. 606 (5th Cir. 1921)........................................................................17

*State ex rel. Guste v. Fedders Corp.*, 20
    524 F. Supp. 552 (M.D. La. 1981)..............................................................20

*State ex rel. Tong v. Exxon Mobil Corp.*,
    83 F.4th 122 (2d Cir. 2023)................................................................24, 25

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) ...........................................................11, 24

*Thames v. State of Mississippi, for Use & Benefit of Shoemaker*,
    117 F.2d 949 (5th Cir. 1941).....................................................................12

*Univ. of S. Ala. v. Am. Tobacco Co.*,
    168 F.3d 405 (11th Cir. 1999)...............................................3, 4, 10, 11, 12

*Univ. of S. Fla. Bd. of Trs. v. CoMentis, Inc.*,
    861 F.3d 1234 (11th Cir. 2017).................................................................12

*Watson v. Phillip Morris Cos. Inc.*,
    551 U.S. 142 (2007).............................................................................2, 24

*West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*,
    646 F.3d 169 (4th Cir. 2011)..................................................................4

## Codes and Statutes

28 U.S.C. § 1442(a)(1) .................................................................................22

FLA. STAT.
    § 501.207(2) ........................................................................................14
    § 501.1736(1)(e)...............................................................................8, 29
    § 501.1736(2)(a)..................................................................................8
    § 501.1736(3)(a)..................................................................................8
    § 501.1736(5) ......................................................................................9

## Other Authorities

*Snap Marks One Year of DHS's "Know2Protect" Campaign*, SNAP VALUES (Apr.
    17, 2025), https://perma.cc/8JN3-TU3K....................................................23

Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory,
    OFF. OF THE SURGEON GEN. (2023), https://perma.cc/3GPW-XDBY.........7, 8

Under centuries-old principles of federal jurisdiction and comity with the States, a federal court may assert jurisdiction over a suit only if the suit could have been brought in federal court in the first place. That is not the case here, and this Court should promptly grant the motion to remand.

To put it simply, this is a state court case. The Florida Office of Attorney General's Department of Legal Affairs ("DLA"), after a state-funded investigation, brought suit in state court to enforce two state laws against Snap—Social Media Use for Minors, FLA. STAT. § 501.1736-.1738 ("H.B. 3"), a recent statute regulating addictive social media platforms' ability to contract with children and teens, and the Florida Deceptive and Unfair Trade Practices Act, Chapter 501, Part II, Florida Statutes ("FDUTPA"), the State's consumer protection statute. DLA raised no federal claims.

Snap's attempts to nevertheless invoke this Court's federal jurisdiction are meritless. First, it is well established that DLA, suing in its official capacity, bears no individual citizenship that can give rise to diversity jurisdiction. Snap's unsupported assertion that DLA is only a "nominal party" and thus not the "real-party in interest" relies on a narrow carve-out that does not apply here. Even assuming Snap's cited caselaw from district courts in other Circuits is relevant, Snap's argument is easily refuted by the briefest glance at the four corners of the Complaint, which seeks to enforce two state statutes consistent with DLA's statutory

mandate to do so. Snap's implication that DLA is merely suing on behalf of specific "identifiable individuals" cannot be squared with the Complaint's extensive allegations that Snap's violations harm not only young Snapchat users but also their parents, and the public at large.

Were there any doubt, the injunctive and punitive nature of the relief the State sought demonstrates that DLA seeks to benefit the State and DLA itself by deterring future violations by Snap and other wrongdoers—not benefit specific individuals. And to put a finer point on the meritless nature of Snap's diversity-jurisdiction argument, suits have been filed by State Attorneys General across the country against Snapchat and other social media companies for alleged violations of state law, to say nothing of state-led enforcement actions more broadly. Where the Attorneys General do not raise a federal claim, those suits have properly proceeded in state court where they were brought. This case should do the same.

Second, Snap's vague and incomplete references—without evidentiary support—to certain limited cooperations with federal government agencies on two awareness initiatives fail to establish the requirements for federal officer jurisdiction. For a private party to remove a state case on the basis of federal officer jurisdiction, "the relationship between the private person and the federal officer must be one of 'subjection, guidance, or control.'" *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1143 (11th Cir. 2017) (quoting *Watson v. Phillip Morris Cos. Inc.*, 551 U.S. 142,

151 (2007)). The Court has extended jurisdiction where "a non-profit entity [is] funded in part by federal loans, [and i]s closer in kind to a federal contractor performing work on behalf of the government than a private business working for its own ends." *Caver*, 845 F.3d at 1144. Snap's bare allegations come nowhere close to this high standard.

Independently, Snap has failed to establish that the conduct of which DLA complains, Snap's numerous and continuing violations of H.B. 3 and FDUTPA, were performed under color of federal law or in any way causally relate to Snap's one-off initiatives involving federal agencies. Snap does not claim that the federal agencies or any other federal officer directed Snap to mislead consumers about its age rating, the mature content on its app, the inefficacy of its parental controls, or its app's addictive and harmful design features. Nor does Snap claim that the federal agencies or any other federal officer directed Snap to violate H.B. 3 by employing statutorily enumerated addictive design features and then proceeding to contract with children under 14 years of age and children who are 14 and 15 years of age without parental consent.

Thus, for two independent reasons, federal officer jurisdiction is inapposite in this case and Snap has fallen far short of the bar required to invoke it.

Federal courts must always take great care to respect the principles of federalism and comity when presented with a notice of removal. *See, e.g., Univ. of*

3

*S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999) ("[R]emoval jurisdiction raises significant federalism concerns."). The Supreme Court has made clear that "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 21 n.22 (1983); *see also West Virginia ex rel. McGraw v. CVS Pharmacy, Inc.*, 646 F.3d 169, 178 (4th Cir. 2011) ("While it is true that West Virginia voluntarily entered into its own courts to enforce its laws, it did not voluntarily consent to removal of its case to a federal court, and a federal court should be most reluctant to compel such removal, reserving its constitutional supremacy only for when removal serves an overriding federal interest.").

Those concerns are *significantly* heightened here, where the state's chief law enforcement officer filed an emergency motion in state court to halt Snap's flagrant violation of state law, and removal has the effect of forestalling that statutorily mandated exercise of state enforcement authority. *See In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 354 F. Supp. 3d 1122, 1124 (N.D. Cal. 2019) ("[W]hen an action has been brought by a state or one of its officials or subdivisions, the need to resolve doubts against the exercise of federal jurisdiction is particularly acute.").

Snap's attempt to delay the enforcement suit pending against it in state court should be rejected, and this case sent back to state court where it belongs.

## FACTUAL BACKGROUND

Snapchat is an extremely popular and harmful social media application operated by Defendant Snap. Exhibit A, Complaint, Doc. 1-1 ¶ 2 ("Compl."). Snapchat allows users to send "disappearing" messages, photographs, and videos. *Id*. ¶ 62. These communications can be viewed by the receiving party or the public but then *disappear* from the platform. *Id.* ¶ 63. This design encourages wrongdoing on the app—indeed, the ephemeral nature of Snapchat, its interactive features, and its use of encryption has created ideal virtual hunting grounds and lairs for predators, drug dealers, sextortionists, and other criminals to lure and exploit young people on the app. *Id.* ¶ 64. Yet Snap knowingly permits young users—including those under the age of fourteen—to use Snapchat in flagrant violation of Florida law prohibiting certain social media apps, including Snapchat, from providing accounts to children of that age. *Id*. ¶¶ 2–3.

To make matters worse, in an investigation of Snapchat, DLA discovered evidence that Snap purposefully targets its app to young people and designed its app to be addictive. *Id*. ¶ 49. The app's manipulative features cause or contribute to myriad physical and mental health problems. The more time young users spend on

Snapchat, the more harm they are exposed to, and the more money Snap makes from advertisements. *Id.*

Snap has not only failed to disclose the truth about the dangers of using its highly addictive app—it has affirmatively lied about it—misleading parents and young people across the State at least hundreds of thousands of times to date. *Id.* ¶ 78. Snap has deceived consumers about the nature of its product in several independent and material ways. First, Snap has relentlessly sought and maintained an app age rating of 12+. *Id.* When a parent or child considers whether to download an app in the Apple App Store or Google Play Store, each app is presented with a corresponding age rating. *Id.* In the Apple App Store, apps can be rated either 12+ or 17+. *Id.* Snap claims a "12+" rating in Apple's App Store, despite that it could select a rating of 17+. *Id.* ¶ 79. Likewise, Snap claims a "T for Teen" rating in the Microsoft and Google Play app stores. *Id.* ¶ 78.

Further, Snap represents that the categories of inappropriate content on Snapchat, including drugs, nudity, alcohol, and profanity, are all "infrequent" and "mild." *Id.* ¶ 80. Snap explicitly claims that its app only contains: "Infrequent/Mild Sexual Content and Nudity," "Infrequent/Mild Profanity or Crude Humor," "Infrequent/Mild Mature/Suggestive Themes," and "Infrequent/Mild Alcohol, Tobacco, or Drug Use or References." *Id.* ¶ 81. These statements are highly deceptive given the abundant availability and intensity of such content on the

Snapchat platform. *Id.* What is more, Snap has developed and promoted various Snapchat features that cause or contribute to real-world harm to young people and the State at large, in ways that both undermine Snapchat's age-rating claims and associated representations and are themselves unconscionable. *Id.* ¶¶ 106–28.

DLA also discovered that Snap has made false, deceptive, and misleading representations about its parental controls, which are ineffective in providing parents meaningful oversight of their teens' use of Snapchat. *Id.* ¶ 129. Further, Snap has made deceptive and misleading public statements that overstate the safety of Snapchat and that misrepresent and omit material information about the app's harmful content and features. *Id.* ¶¶ 132–37.

Finally, DLA discovered that Snap has failed to disclose critical facts about its efforts to intentionally addict young users and the harmful effects of its addictive features. *Id.* ¶¶ 49–60. As the U.S. Surgeon General explained in a recent advisory, social media platforms like Snap use features like "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations" that lead to "excessive use and behavioral dysregulation." *Id.* ¶ 43 & n.5 (citing Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory at 9, OFF. OF THE SURGEON GEN. (2023), https://perma.cc/3GPW-XDBY ("*Surgeon General's Advisory*")).

Because addiction to social media has fueled the Nation's "youth mental health crisis," *Id.* (citing *Surgeon General's Advisory* at 13), the U.S. Surgeon General has called on policymakers to develop "health and safety standards" for platforms and to adopt "policies that further limit access . . . to social media for all children[.]" *Surgeon General's Advisory* at 15. The Surgeon General has specifically recommended policies that "limit[] the use of features that attempt to maximize time, attention, and engagement[.]" *Id.*

The State of Florida did just that, passing H.B. 3, a state statute that protects children from platforms with addictive features by regulating the platforms' contracts with children. When a platform transacts with a child to create a personal account, it can target the child with addictive features like "personal interactive metrics," "[p]ush notifications," "[i]nfinite scrolling," and "[a]uto-play video." FLA. STAT. § 501.1736(1)(e). If a platform chooses to engage in those practices—as Snap has done—H.B. 3 limits its ability to "enter[] into a contract" with a child "to become an account holder." *Id.* §§ 501.1736(2)(a), (3)(a).

Snap has and continues every day to openly violate H.B. 3. *See* Compl. at 8. Even when a new user in Florida *tells* Snap as part of the process for signing up for an account that he is 13 years old, Snap proceeds to contract with the user and allows him to create an account. *Id.*

8

By statute, violations of H.B. 3 are enforceable by DLA, which "may bring an action against such platform for an unfair or deceptive act or practice" under Part II of Section 501, Florida Statutes. FLA. STAT. § 501.1736(5). This allows DLA to seek civil penalties and, "[i]n addition," it may pursue "other remedies under part II" of Section 501, including an injunction under Section 501.207(1)(b). *Id.* So too, DLA is an enforcing authority for Florida's state consumer protection statute, FDUTPA. DLA is afforded the authority to seek the full range of relief available under the state statute.

Accordingly, on April 21, 2025, DLA brought this suit in Florida state court to enforce two Florida state statutes in light of Snap's egregious violations. The Attorney General's first claim concerned Snap's open and willful violations of H.B. 3. The second claim was for injunctive relief and civil penalties based on Snap's countless violations of the FDUTPA. The Attorney General cataloged Snap's false, misleading, and unconscionable acts, statements, and omissions concerning Snapchat's claimed 12+ age-rating, the app's addictive design and features, and the inefficacy of parental controls, among other things.

On May 1, 2025, the Attorney General filed a motion for temporary injunction in Florida state court, requesting that the state court urgently enjoin Snap's open and egregious violations of H.B. 3. On May 21, without having responded to the

temporary injunction motion, Snap removed the Attorney General's enforcement suit to federal court.

## LEGAL STANDARD

"Federal courts are courts of limited jurisdiction." *Burns v. Windsor Ins. Co*., 31 F.3d 1092, 1095 (11th Cir. 1994). For this reason, "removal is only permissible when plaintiff's claim could have been filed in federal court originally." *Id.*

"Because removal jurisdiction raises significant federalism concerns, federal courts are directed to construe removal statutes strictly." *Univ. of S. Ala.*, 168 F.3d at 411 (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S. 100, 108–09 (1941)). In this sense, "Defendant's right to remove and plaintiff's right to choose his forum are not on equal footing . . . removal statutes are construed narrowly; where plaintiff and defendant clash about jurisdiction, uncertainties are resolved in favor of remand." *Burns*, 31 F.3d at 1095. Thus, "all doubts about jurisdiction should be resolved in favor of remand to state court." *Univ. of S. Ala.*, 168 F.3d at 411 (citing *Burns,* 31 F.3d at 1095); *see, e.g. Univ. of S. Ala.*, 168 F.3d at 412 ("[I]n light of the significant federalism concerns raised by removal and the principle that all doubts about jurisdiction should be resolved in favor of remand . . . it would be more prudent to remand this case pursuant to 28 U.S.C. § 1447(c) and provide the state court with the opportunity to resolve this unique and complicated question of state law.").

So too, the removing defendant bears the burden of proof, and "the defendant's burden of proof must be a heavy one." *Burns*, 31 F.3d at 1095. "[T]he removing party, [the defendant] bears the burden of proof," and is "obligated to support the factual averments linking his conduct and his [federal] office 'by competent proof.' " *State v. Meadows*, 88 F.4th 1331, 1348 (11th Cir. 2023), *cert. denied*, 145 S. Ct. 545 (2024) (Mem.) (internal quotation marks omitted).

The long-held "presumption in favor of remand is necessary because if a federal court reaches the merits of a pending motion in a removed case where subject matter jurisdiction may be lacking," the federal court "deprives a state court of its right under the Constitution to resolve controversies in its own courts." *Univ. of S. Ala.*, 168 F.3d at 411.

## ARGUMENT

### I.    Snap Has Failed to Establish Federal Diversity Jurisdiction in this Suit by the State's Office of Attorney General.

Snap has failed to establish diversity jurisdiction. Diversity jurisdiction may only lie where: (1) adverse parties are not citizens of the same state *and* (2) each party is affirmatively a citizen of "any state in the Union" or is a foreign citizen. *Cameron v. Hodges*, 127 U.S. 322, 324–25 (1888); *see Newman-Green, Inc. v.*

*Alfonzo-Larrain*, 490 U.S. 826, 829 (1989); *Univ. of S. Fla. Bd. of Trs. v. CoMentis, Inc.*, 861 F.3d 1234, 1235 (11th Cir. 2017).

It is well established that DLA, suing in its official capacity, bears no individual citizenship that can give rise to diversity jurisdiction. *See, e.g.*, *Univ. of S. Ala.*, 168 F.3d at 412 ("It is well established that a state is not a citizen of a state for the purpose of diversity jurisdiction under 28 U.S.C. § 1332.").

In response to this straightforward conclusion, Snap cites primarily out of circuit authority for the idea that a State is not the "real party in interest" if it has "no real interest in the controversy." Def. Snap Inc.'s Notice of Removal, Doc. 1, ¶ 25 (May 21, 2025) ("Notice"). The thrust of Snap's argument is that "OAG is a nominal party at best because the relief it seeks is directed at 'tens of thousands of [Snap] users [in Florida] who are under 16 years old.'" *Id.* ¶ 26 (citing Compl. ¶ 11). Snap further speculates that "[t]he primary, if not exclusive, alleged beneficiaries of the OAG's Complaint would be identifiable, individual Florida citizens under 16 years old who use Snap." *Id.* ¶ 27.

This argument fails. True, "a nominal party having no interest in the result and not in control of the litigation, or a next friend who has no right of action in himself though in control of the litigation, is not to be considered [for diversity purposes]." *Thames v. State of Mississippi, for Use & Benefit of Shoemaker*, 117 F.2d 949, 951 (5th Cir. 1941). But DLA is in control of the prosecution of this

lawsuit and plainly has an interest in its outcome. It begs credulity to argue that the State of Florida, through DLA, has "no real interest" in Snap's violations of *two* state statutes that DLA is statutorily directed to enforce, one of which Snap violates openly. DLA is commanded by statute to enforce both the State's consumer protection law and H.B. 3, and the State's primary law enforcement office has an interest in the blatant violation of the State's own duly enacted legislation. Besides this obvious *legal* interest in the outcome of the litigation, DLA and by extension the State also bears an interest in the real-world harm Snap has inflicted and continues to inflict on the youth of the State and their teachers, families, and communities.

What is more, Snap's factual premises are simply wrong. Snap muddles the State's assertion of *harm* with the *relief* the State seeks. Of course as is the case for *any* civil or criminal enforcement action, the basis for harm is to the people of Florida, who are protected by both H.B. 3 and FDUTPA. Snap has not harmed DLA personally, and DLA enjoys no special protection or benefits under either statute. But the *relief* DLA seeks is an injunction to halt Snap's unlawful conduct and civil penalties to the State to punish and deter Snap and other future wrongdoers over whom DLA would have enforcement authority. That relief is "directed" to the State, Notice ¶ 26, not to some other unnamed individuals.

Relatedly, Snap claims that "OAG's Complaint purports to seek monetary and injunctive relief allegedly for the direct benefit of identifiable, individual Florida citizens." *Id.* ¶ 27. But here again, Snap mischaracterizes DLA's claims. DLA seeks neither monetary relief nor injunctive relief for any particular individuals. DLA seeks civil penalties to be paid to the State and injunctive relief to halt Snap's illegal actions *throughout Florida* as to all consumers—those who use Snapchat and those who may use Snapchat in the future. Indeed, DLA seeks largely to halt Snap from openly violating State law, it does not seek to gain anything for any particular consumers, let alone any identifiable group of them. DLA's enforcement of state law seeks to benefit the entire State, including the State government's interest in the respect for its duly enacted state statutes, not particular individuals.

That the public at large will benefit from the enforcement of state law against violators does not change this conclusion and is no remarkable proposition. Indeed, FDUTPA *requires* DLA to determine that an enforcement action serves the public interest before bringing suit. FLA. STAT. § 501.207(2).

In any case, even where state Attorneys General *have* sought monetary relief on behalf of particular individuals, courts have still rejected the argument that the State is no longer the real party in interest. *See, e.g.*, *AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 394 (4th Cir. 2012) ("We therefore agree with the Ninth and Seventh Circuits that a claim for restitution, when tacked onto other claims being

properly pursued by the State, alters neither the State's quasi-sovereign interest in enforcing its own laws, nor the nature and effect of the proceedings."); *LG Display Co. v. Madigan*, 665 F.3d 768, 773 (7th Cir. 2011) ("Whether a state is the real party in interest in a suit 'is a question to be determined from the essential nature and effect of the proceeding.'" (quoting *Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 250 (7th Cir. 1981)).

If there were any doubt about DLA's interest in this case, the punitive nature of the suit resolves it. As Snap emphasizes, DLA seeks punitive damages and civil penalties. Those remedies are just that—penalties that no private plaintiff could personally recover. *See Jordan v. Closet Factory Franchise Corp.*, No. 24-12229, 2025 WL 1100911, at *5 (11th Cir. Apr. 14, 2025) ("Since this action was brought by a private individual—not the [Florida Attorney General]—a civil penalty is unavailable under the FDUTPA."). The enforcement suit seeks to punish Snap for its repeated and egregious violations of two state statutes. The State plainly has an interest in deterring other bad actors from openly violating its duly enacted legislation in addition to protecting its consumers and its children from the addictive design features used by certain social media apps.

For these reasons, courts across the nation have frequently and decisively rejected arguments that a state Attorney General is not the real party in interest in a state enforcement suit. *See, e.g.*, *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 664

(9th Cir. 2012) (rejecting assertion of diversity jurisdiction where Nevada Attorney General brought case against out-of-state bank despite the fact that the Attorney General sought restitution for the victims of fraud); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 354 F. Supp. 3d at 1135–36 ("[T]his case does not come close to the line, because it's clear that Foxx's lawsuit serves primarily the interests of the State of Illinois. The lawsuit seeks civil penalties that private citizens could not obtain – penalties that would punish fraud against Illinois residents and deter future similar wrongdoing in the State. It seeks statewide injunctive relief to prevent future violation of the privacy rights of a large and diffuse group of Illinois residents – a matter of statewide concern."); *Hood v. AstraZeneca Pharms., LP*, 744 F. Supp. 2d 590, 596 (N.D. Miss. 2010) (remanding where "[t]he Attorney General in this case is bringing suit on behalf of the State, and the State is the party with a substantial interest in the outcome."); *Harvey v. Blockbuster, Inc.*, 384 F. Supp. 2d 749, 755–56 (D. N.J. 2005) (remanding where "[t]he action seeks, *inter alia*, to permanently enjoin [defendant] from allegedly violating [a state statute], which would directly benefit all New Jersey consumers"); *Illinois ex. rel. Scott v. Hunt Int'l Res. Corp.*, 481 F. Supp. 71, 74 (N.D. Ill. 1979) (granting motion to remand brought by Illinois Attorney General concerning state consumer-fraud-law violation); *Kansas ex rel. Stovall v. Home Cable*, 35 F. Supp. 2d 783, 784–86 (D. Kan. 1998) (remanding action brought by Kansas Attorney General to enforce state consumer-protection

16

law; rejecting argument that citizenship of actual aggrieved consumers should be considered).

In one analogous case, the court rejected an assertion that the Florida Attorney General was not the real party in interest where the Attorney General alleged that "the Defendants violated certain provisions of Florida statutory law designed to protect the economic welfare of Florida's citizens." *Florida v. Memberworks, Inc.*, No. 8:03-CV-2267-T-26TGW, 2003 WL 27374081, at *3 (M.D. Fla. Dec. 23, 2003). "In order to redress those violations," the court explained, "the Attorney General of the State of Florida, as head of the Department of Legal Affairs . . . brought this action against the Defendants pursuant to express grants of statutory authority . . . and otherwise in accord with his common law duty to protect the public interest." *Id.* (citing *State of Florida ex rel. Shevin v. Exxon Corp.*, 526 F. 2d 266, 274 (5th Cir. 1976) (concluding that the Attorney General of Florida retains the common law power to institute lawsuits to protect the public interest)); *see also Robertson v. Jordan River Lumber Co.*, 269 F. 606, 607 (5th Cir. 1921) (observing that "[a] suit by an agent of the state as a nominal party in behalf of the state presents a controversy to which the state is a party, and cannot be removed to the United States court as a controversy between citizens."); *Gunter v. AGO Int'l B.V.*, 533 F. Supp. 86, 88 (N.D. Fla. 1981) (holding that Florida Insurance Commissioner was

alter ego of the State and not a citizen for purposes of federal diversity jurisdiction and collecting cases).

In another analogous case, the Florida Department of Agriculture and Consumer Services filed suit in state court alleging that defendants engaged in illegal "price gouging" in the wake of several hurricanes. *Florida v. Exxon Mobil Corp.*, No. 4:10CV21-RH/WCS, 2010 WL 11579390, at *1 (N.D. Fla. Apr. 16, 2010). The Court rejected the defendants' argument that "the Department brought this case on behalf of the citizens who allegedly were gouged and that, for jurisdictional purposes, those citizens are the real party plaintiffs, thus establishing diversity." *Id.* "[T]hat is incorrect," the Court explained, because "[t]he state is the real party plaintiff—or at least a party plaintiff—and the case thus is not within the court's diversity jurisdiction." *Id.* As here, "Florida ha[d] a substantial stake in th[e] litigation," *id.* at *5, "[t]he Department sued to enforce Florida [state] law," *id.*, and "among the primary purposes of a state that files an action of this kind are to [deter] … unscrupulous businesses from taking advantage of consumers," *id.* "Many other cases have reached the same result." *Id.* at *3 (collecting further cases).

Snap's cited cases only serve to demonstrate by way of comparison how baseless Snap's argument is in this case. *Department of Fair Employment and Housing v. Lucent Technologies* was an employment discrimination lawsuit brought by a state agency seeking reinstatement and payment of compensatory and punitive

damages to a single employee who was specifically identified as "the real party in interest" under California law. 642 F.3d 728, 739 (9th Cir. 2011) (quoting CAL. GOV'T CODE § 12965(c)(2)). The Ninth Circuit later distinguished *Lucent Technologies* on precisely those grounds in a case much more like this one, where "the Nevada Attorney General sued to protect . . . hundreds of thousands of homeowners" from fraud under its state consumer protection statute. *Nevada*, 672 F.3d at 670. Even putting aside Judge Ikuta's cogent criticisms of the majority opinion in *Lucent Technologies*, *see* 642 F.3d at 749–53 (Ikuta, J., dissenting), binding circuit precedent would foreclose Snap's diversity jurisdiction argument if this case were in the Ninth Circuit.

Snap also cites *Ohio v. GMAC Mortg., LLC*, a case in which the State of Ohio sued on behalf of certain homeowners against the allegedly fraudulent foreclosures of hundreds of Ohio homes. The court found that the State was a nominal party because it lacked a sufficient *parens patriae* "interest in the health and well-being—both physical and economic—of its residents in general." 760 F. Supp. 2d 741, 749 (N.D. Ohio 2011). Here, by contrast, the health and well-being of residents is the *precise thrust* of this suit. *See, e.g.*, Compl. ¶¶ 1–2, 39, 41–43, 61, 149. The first sentence of the Complaint makes this abundantly clear: "There is a widespread consensus among parents, teachers, and experts in teen mental health that compulsive use of social media is harmful to teens' well-being." *Id.* ¶ 1. DLA's

enforcement action seeks to protect the "health and well-being," *Ohio*, 760 F. Supp.

2d at 749, of all children, tweens, and teens in Florida (including those who do not

yet use Snapchat but may do so if Snap's violative actions are not enjoined), as well

as their parents and other adult guardians, who have been or could be misled by

Snap's false assurances about the safety of its app.[1]

As for whether DLA's suit seeks to benefit a wide enough group of citizens,

even accepting Snap's non-binding authority as relevant here, there is no question

that this suit meets the required threshold for an interest in the well-being of citizens

*in general*. The *Ohio* court required that an alleged "indirect injury must affect a

sufficiently substantial segment of the state's population." 760 F. Supp. 2d at 749–

50. "As a rule of thumb, this prong is met if the state would likely attempt to address

the injury through its sovereign lawmaking powers, if able." *Id.* at 750. Here, the

Court need not speculate whether that prong is met because the State has *already*

addressed the injury through its lawmaking powers—it enacted H.B. 3 to address the

urgent mental health crisis caused by addictive social media apps like Snapchat. *See*

*LG Display Co.*, 665 F.3d at 771 ("An 'alleged injury to the health and welfare of

---

[1] In Snap's other cited case, an out-of-Circuit district court considered whether a state entity was "of sufficient autonomy" that it should be considered a citizen for diversity jurisdiction purposes. *State ex rel. Guste v. Fedders Corp*, 524 F. Supp. 552, 557 (M.D. La. 1981). Snap makes no argument to that effect here. Nor could it, for the Office of the Attorney General is not a "corporate body subject to suit." *Id.* at 558.

its citizens suffices to give the State standing to sue as *parens patriae* [if] the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982))). Indeed, Snapchat is an extremely popular product in Florida, and it would be difficult to imagine a state-led enforcement action that sweeps in more of the State's population.

In the end, Snap's novel argument belies the reality of State Attorney General enforcement suits pending and resolved for decades in state courts across the nation. Even focusing only on Attorney General-led lawsuits brought against large social media companies across the country in recent years, of the dozens of suits of which DLA is aware, very few defendants have even *attempted* removal. And those few defendants that have attempted removal were met with remands back to state court. *See Indiana v. TikTok, Inc.*, No. 1:23-cv-13-HAB, 2023 WL 3596360, at *4 (N.D. Ind. May 23, 2023); *Arkansas ex rel. Griffin v. TikTok Inc.*, No. 1:23-CV-01038, 2023 WL 4744903, at *4 (W.D. Ark. July 25, 2023); *California v. TikTok, Inc.*, No. 4:24-CV-07942-YGR, 2025 WL 683730 (N.D. Cal. Jan. 28, 2025). While the theories for federal jurisdiction presented in those cases differed from the ones presented in Snap's notice of removal, it is telling that so many similar lawsuits brought against Snap and its competitors by state Attorneys General across the country are proceeding in state court.

More broadly, Snap's new rule would render it effectively impossible for a state Attorney General to ever sue to enforce state law against an out-of-state business in the courts of its own state. This would flood the federal courts with all manner of state enforcement suits, including quotidian consumer protection actions. No law requires all state enforcement suits against out-of-state businesses to be brought exclusively in federal fora, and it would be a severe affront to federalism and principles of comity to find otherwise.

## II.   Snap, A Private For-Profit Company with Negligible, Unrelated, and Unsupported Contacts with the Federal Government, Has Failed to Establish Federal Officer Jurisdiction.

A state suit may be removed to federal court on the basis of federal officer jurisdiction only when the suit was brought "against or directed to": (1) the United States, (2) an "agency thereof," or (3) "any officer (or person acting under that officer) of the United States or of any agency thereof, in an individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). This provision "is designed to provide federal officials with a federal forum in which to raise defenses arising from their official duties." *Caver*, 845 F.3d at 1142 (citation and internal quotation marks omitted).

"Because [Snap] is not a federal officer or agency itself, [it] must satisfy a three-pronged test to determine whether it may effect removal." *Id.* First, Snap "must show that it is a person within the meaning of the statute who acted under a federal

officer." *Id.* (citing U.S.C. § 1442 (a)(1)). Second, Snap "must show that it performed the actions for which it is being sued under color of federal office. . . ." *Id.* Stated another way, Snap "must show 'a causal connection between what [it] has done under asserted official authority and the action against him.'" *Id.* (citation omitted). Third, Snap "must raise a colorable federal defense." *Id.* Although Snap has asserted federal defenses, it utterly fails to satisfy the other two requirements.

### A. Snap Has Failed to Establish that it Acted Under a Federal Officer.

Snap bases its claim of federal officer jurisdiction on allegations that Snap participated in two awareness campaigns in coordination with employees of federal agencies. As to DHS, Snap's recent public reporting of the DHS initiative states that Snap "donated advertising space" to the campaign beginning about one year ago. *Snap Marks One Year of DHS's "Know2Protect" Campaign*, SNAP VALUES (Apr. 17, 2025), https://perma.cc/8JN3-TU3K. And as to the FDA, Snap claims it interacted with a "media agency" hired by the FDA to manage FDA's "self-serve" advertiser account on Snapchat. Notice ¶ 19. Snap claims that FDA pursued "multimillion dollar Snap advertising campaigns in 2024." *Id.* ¶ 18.

As an initial matter, it is difficult to evaluate whether Snap committed the unlawful acts and omissions alleged in the Complaint under a federal officer and under color of federal law because Snap failed to substantiate any of its allegations in the notice of removal with evidentiary support. Snap provides no affidavits, either

from Snap employees, the private media agencies, or federal employees involved in the raising-awareness projects. Snap references the existence of Memoranda of Understanding with federal employees, *see id.* ¶¶ 12, 39, but neglected to provide those memoranda to the Court.

Even solely focusing on Snap's *allegations*, Snap describes the two awareness initiatives it worked on relating in some way to the federal government, but declined to elucidate the details or extent of that relationship, the origins of the projects, who retained ultimate control and supervision, whether the project was paid or unpaid, whether the memoranda of understanding was in the nature of a contract, and other facts that courts must consider when evaluating a private company's claim that it is entitled to invoke federal officer jurisdiction. *See, e.g.*, *Caver,* 845 F.3d at 1142–44.

Snap's failure to even attempt to reach its evidentiary burden is reason enough to reject its invocation of federal officer jurisdiction. Removing defendants must show a factual basis for the "acting under" relationship, not just conclusory allegations. *Watson*, 551 U.S. at 142 (quoting 28 U.S.C. § 1442(a)(1)). "As the removing party, [the defendant] bears the burden of proof," and is "obligated to support the factual averments linking his conduct and his [federal] office 'by competent proof.'" *Meadows*, 88 F.4th at 1348 (citation omitted).

Applying these principles, one court found it "fatal" to a removal effort where a Defendant "put forth record evidence of the significant volume of fossil fuels that

it still provides to the military each year, [but] the record contain[ed] no indication of the degree of 'supervision' or 'control' that the federal government exerts over [the Defendant's] production of such fuels." *State ex rel. Tong v. Exxon Mobil Corp.*, 83 F.4th 122, 144 (2d Cir. 2023) (quoting *Watson*, 551 U.S. at 151) (emphasis omitted). It is Snap that bears the "burden of providing 'candid, specific and positive' allegations that [it was] acting under federal officers when' its alleged campaign of deception was underway.' " *State ex rel. Tong*, 83. F.4th at 144 (quoting *In re MTBE*, 488 F.3d 112, 130 (2d Cir. 2007)). Here, Snap has provided *no* evidence whatsoever, which should be "fatal" to its claim of federal jurisdiction. *Id.* At the very least, Snap has not provided sufficient evidence (or even allegations) surrounding the degree of federal government supervision and control over Snap's alleged wrongdoings.

In any case, even stretching Snap's bare allegations as far as they will go, Snap has not come close to establishing a case for federal officer jurisdiction. Extending federal officer jurisdiction to a private party requires an "extensive interrelationship between the federal government and Defendant." *Caver*, 845 F.3d at 1138.

Snap's alleged interactions are the opposite: episodic, casual, and limited to two collaborations, often several steps removed from the actual agency. As to the FDA project in particular, it appears from Snap's Notice of Removal that Snap employees may not have interacted with any FDA officers or employees at all,

instead communicating only with a "media agency" that managed FDA's advertiser account on Snapchat. Notice ¶ 19. As to DHS as well, Snap reports working with "both DHS and DHS's advertising contractor." *Id.* ¶ 15. Snap has not claimed that the private advertising contractors are themselves federal officers and has not elucidated the degree of interrelationship Snap maintains with the government itself, rather than these other private individuals. Further, on the DHS project, the relationship between Snap and the contracting agency is an even *further* step removed. Snap alleges that it "connected DHS and its contractor to a longtime production partner," who in turn helped with DHS's initiative. *Id.* "DHS's contractor coordinated directly with the production partner on Know2Protect lens development, revisions, and feedback cycles." *Id.* In other words, at least two layers of middlemen separated Snap from any close working relationship with a federal officer or agency. In sum, Snap has simply not claimed the "extensive interrelationship" with a federal agency or officer that is required. *Caver*, 845 F.3d at 1138.

This is not a close case. *Caver v. Central Alabama Electric Cooperative*, the key case upon which Snap chiefly relies, demonstrates just how far afield from a proper assertion of federal officer jurisdiction Snap's alleged facts are. *Id.* at 1142–44. There, the Court granted federal-officer jurisdiction to a rural electric cooperative. The Court surveyed the history of the deep practical, historical, and legal entwinement between such entities and the federal government, explaining that

"rural electric cooperatives ['REA'] are something more than public utilities; they are instrumentalities of the United States. They were chosen by Congress for the purpose of bringing abundant, low cost electric energy to rural America." *Id.* at 1143. (quoting *Ala. Power Co. v. Ala Elec. Coop., Inc*., 394 F.2d 672, 677 (5th Cir. 1968)). This entanglement was by design and enshrined by statute: "Congress and the President designed a system by which the REA would accomplish these goals by loaning money to state entities, which would carry out these objectives under the REA's close supervision." *Carver*, 845 F.3d at 1143. The sole purpose and reason for existence of these entities was "to provide a public function conceived of and directed by the federal government." *Id.* at 1144.

Critically, the Court found that the defendant in *Caver*, "a non-profit entity funded in part by federal loans, [wa]s closer in kind to a federal contractor performing work on behalf of the government than a private business working for its own ends." *Id.* For these reasons, the Court could conclude that the defendant was "'acting under' a federal officer for purposes of § 1442(a)(1) based on the long history of [the federal government's] control over [the defendant] and direction of the federal government's rural electrification program dating back to the Great Depression." *Id.* In sum, the Court extended federal officer jurisdiction to the private defendant in *Caver* because the defendant "has an unusually close and detailed regulatory and contractual relationship with [the federal government] dating back to

27

1939, and that relationship controls almost all of [the defendant's] actions." *Id.* at 1146.

Snap stands in stark contrast to the removing defendant in *Caver*. Snap has not alleged any "unusually close" relationship with the federal government. *Id.* Nor has Snap identified any historical basis for a longstanding entwinement, as the Court found critical there. *Id.* And, importantly, Snap has not claimed that its relationship with the federal government "controls almost all of [its] actions," as the Court required in *Caver*. *Id.* Neither is Snap "a non-profit entity funded in part by federal loans." *Id.* at 1144. Quite the opposite—Snap is "a private business working for its own ends." *Id.* Snap's occasional and episodic interactions with federal regulators fall far short of the showing required to give Snap the benefit of federal officer jurisdiction.

Tellingly, in the motion to dismiss DLA's suit that Snap recently filed in this Court, *see* Mot. for Stay and to Dismiss, ECF No. 11 (May 28, 2025), Snap advanced several federal-law arguments yet made no mention whatsoever of any claimed interference with federal functions. Yet the "basic purpose" of federal officer jurisdiction "is to protect the Federal Government from state interference with its operations." *Caver*, 845 F.3d at 1142.

28

**B. Snap Has Failed to Establish that it Committed the Acts Alleged in the Attorney General's Enforcement Action Under Color of Federal Office.**

The mere fact that a defendant interacts with a federal officer in some way is not sufficient to satisfy the 'acting under' requirement. Rather, the removing defendant "must show 'a causal connection between what the officer has done under asserted official authority and the action against him.'" *Id.*(citation omitted).

Rather than make this required showing, Snap largely ignores the conduct that is actually relevant to this suit. As to H.B. 3, DLA alleges that H.B. 3 only applies in the first place because Snap has voluntarily adopted certain addictive features and in fact has proven addictive to young people in Florida. *See* FLA. STAT. § 501.1736(1)(e). That is a threshold requirement of DLA's H.B. 3 enforcement suit. *Id.* Snap makes no showing whatsoever that any federal government agency or officer, in the course of Snap or its middlemen's participation in two awareness campaigns with media agencies contracted by government agencies, directed Snap to adopt these addictive features or that the features in any way relate to Snap's involvement in these episodic initiatives. Indeed, Snap's addictive features long predate its involvement in the two initiatives, which seem to have begun as recently as 2024. Notice ¶ 12 (DHS); *id.* ¶ 18 (FDA).

As to DLA's consumer protection claim, Snap has made no showing that the relevant alleged conduct—Snap's deceptive statements about Snapchat's age ratings, the inefficacy of Snap's advertised parental controls, and the addictive and

harmful design features of the Snapchat app—in any way relate to its brief participation in promoting advertisements for two federal agencies.[2] Snap's alleged acts "acting under" a federal officer are entirely irrelevant to the substance of the Complaint's allegations regarding Snap's extensive and egregious violations of Florida law.

### III.    The Court Should Award Fees and Costs.

"If [a] federal court lacks subject matter jurisdiction . . . the case must be remanded, and '[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal.' " *Bauknight v. Monroe Cnty., Fla.*, 446 F.3d 1327, 1329 (11th Cir. 2006) (quoting 28 U.S.C. § 1447(c)).

"[T]he standard for awarding fees should turn on the reasonableness of the removal." *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005). Generally, a federal district court may award attorney's fees following a removal "where the removing party lacked an objectively reasonable basis for seeking removal." *Id.* In elucidating this standard, the Supreme Court rejected the Solicitor General's argument for a more stringent standard: "frivolous, unreasonable, or without

---

[2] For this reason, although Snap has established no basis for federal jurisdiction over *either* claim in this case, the Court should in particular decline to assert supplemental jurisdiction over the Attorney General's state consumer protection enforcement claim.

foundation," the standard the Court imposes for awarding fees in other cases. *Id.* at 138.

The more permissive standard for awarding fees and costs after improper removal was intended in part "to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party." *Bauknight*, 446 F.3d at 1329 (quoting *Martin*, 546 U.S. at 140). After all, "[t]he process of removing a case to federal court and then having it remanded back to state court delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources." *Martin*, 546 U.S. at 140.

That standard is met here. As evidenced above, Snap has no objectively reasonable basis to argue that DLA had no "real interest" in this litigation to enforce two state statutes and to protect the health and well-being of all young Floridians and their parents and guardians. Nor does Snap have any objectively reasonable basis to assert federal officer jurisdiction where it merely alleged it worked on isolated advertisement campaigns with media agencies working for federal agencies and provided zero record evidence.

Further, in light of the circumstances surrounding the pending state enforcement action against Snap, and especially DLA's recent temporary injunction motion to enjoin Snap's current operations, Snap's effort was the kind of removal "sought for the purpose of prolonging litigation" that the Supreme Court sought to

"deter." *Id.* Snap's arguments for federal jurisdiction are utterly without merit and readily satisfy the standard for an award of fees under 28 U.S.C. § 1447(c).

## CONCLUSION

The motion to remand should be granted.

Dated: May 30, 2025                          Respectfully Submitted,

By: /s/ David H. Thompson                    JAMES UTHMEIER
David H. Thompson                            ATTORNEY GENERAL
Brian W. Barnes*                             STATE OF FLORIDA
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.                Donna Cecilia Valin
Washington, D.C. 20036                         (FL Bar No. 96687)
Tel: (202) 220-9600                          Special Counsel, Assistant Attorney
Fax: (202) 220-9601                          General
dthompson@cooperkirk.com                     Consumer Protection Division
bbarnes@cooperkirk.com                       135 West Central Blvd.
                                             Orlando, FL 32801
*Admitted *pro hac vice*                     (407) 316-4840
                                             Donna.valin@myfloridalegal.com

                                             Victoria Ann Butler (FL Bar No.
                                             861250)
                                             Director of Consumer Protection
                                             Litigation
                                             3507 E. Frontage Road, Suite 325
                                             Tampa, FL 33607
                                             (813) 287-7950
                                             Victoria.butler@myfloridalegal.com

                                             Diane Kondor Oates (FL Bar No.
                                             116233)
                                             Senior Assistant Attorney General
                                             Consumer Protection Division
                                             1 SE 3rd Avenue

Miami, FL 33131
(305) 377-5835
Diane.oates@myfloridalegal.com


*Attorneys for Office of the Attorney General,*
*State of Florida, Department of Legal Affairs*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Local Rule 7.1(c), I hereby certify that on May 30, 2025, I caused

a true and correct copy of the foregoing Memorandum of Law in Support of Motion

for Remand to be electronically filed with the Clerk of the Court using CM/ECF and

to be served via electronic mail upon the following counsel as indicated below:

Alfred Benjamin Gordon, III
Anne Nicole Izzo
ANCHORS GORDON PA
2113 Lewis Turner Blvd., Suite 100
Fort Walton Beach, FL 32547
850-863-1974
bgordon@anchorsgordon.com
aizzo@anchorsgordon.com

Katherine Booth Wellington
Reedy Swanson
HOGAN LOVELLS US LLP
555 13th St NW
Washington, DC 20004-1109
202-637-5600
katherine.wellington@hoganlovells.com
reedy.swanson@hoganlovells.com

Lazaro Fields
CONTINENTAL PLLC
101 N Monroe Street
Suite 750
Tallahassee, FL 32301
850-332-0702
LFields@ContinentalPLLC.com

Christopher M Kise
CHRIS KISE & ASSOCIATES
201 East Park Avenue, 5th Floor
Tallahassee, FL 32301
850-933-4913
chris@ckise.net

*Counsel for Defendant*

Respectfully submitted,

/s/ David H. Thompson

*Attorney for Office of the Attorney General,*
*State of Florida, Department of Legal Affairs*

34

## <u>LOCAL RULE 7.1(F) CERTIFICATE REGARDING</u>
## <u>WORDS IN MEMORANDUM</u>

I, David H. Thompson, hereby certify that this memorandum of law, excluding the case style, signature block, certificate of service, and Tables of Contents and Authorities, contains 7,628 words.

Respectfully submitted,

<u>/s/ David H. Thompson</u>

*Attorney for Office of the Attorney General,*
*State of Florida, Department of Legal Affairs*