# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

OFFICE OF THE ATTORNEY GENERAL,
STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

                *Plaintiff*,

v.

SNAP INC.,

                *Defendant*.

Case No. 3:25-cv-676-MW-HTC

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................4

I.    Snap Assists Federal Government Agencies In Fulfilling Their Statutory Mandates To Reach U.S. Teenagers With Important Public Service Messages ...........................................4

II.    HB3 Sharply Curtails Snap's Ability To Assist The Federal Government ...............................................................8

III.    DLA Opposes A Federal Pre-Enforcement Preliminary Injunction And Files Suit In State Court....................................9

LEGAL STANDARD.........................................................................12

ARGUMENT ...............................................................................13

I.    This Court Has Jurisdiction Under The Federal Officer Removal Statute................................................................13

1. Snap Meets The "Acting Under" Requirement...................................15

2. Snap Meets The Nexus Requirement ....................................21

II.    The Court Has Diversity Jurisdiction Because DLA Is Not The Real Party In Interest.........................................................25

III.    The Court Has Supplemental Jurisdiction Under Section 1442(a)(1) and Section 1367 ....................................32

IV.    Fees And Costs Are Plainly Unwarranted................................33

CONCLUSION .................................................................35

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Anderson v. Wilco Life Ins. Co.*,
    943 F.3d 917 (11th Cir. 2019) ....................................................................13

*Anesthesiology Assocs. of Tallahassee, Fla., P.A. v.*
    *Blue Cross Blue Shield of Fla., Inc.*,
    No. 03-15664, 2005 WL 6717869 (11th Cir. Mar. 18, 2005) .......................19

*Agyin v. Razmzan*,
    986 F.3d 168 (2d Cir. 2021) .........................................................................20

*Alfred L. Snapp & Son v. Puerto Rico*,
    458 U.S. 592 (1982)................................................................................26, 31

*American Lung Ass'n of N.H. v. American Lung Ass'n*,
    No. CIV. 02-108-B, 2002 WL 1728255, (D.N.H. July 25, 2002)................30

*AU Optronics Corp. v. South Carolina*,
    699 F.3d 385 (4th Cir. 2012) .......................................................................30

*Bennett v. MIS Corp.*,
    607 F.3d 1076 (6th Cir. 2010) .....................................................................19

*Board of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*,
    996 F.3d 243 (4th Cir. 2021) .................................................................20, 24

*Burns v. Windsor Ins. Co.*,
    31 F.3d 1092 (11th Cir. 1994) .....................................................................14

*Caver v. Central Ala. Elec. Coop.*,
    845 F.3d 1135 (11th Cir. 2017) ...................................... 14, 16-19, 21, 22, 24

*Colorado v. Symes*,
    286 U.S. 510 (1932)................................................................................20, 21

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*,
    No. 4:24-cv-438-MW/MAF, 2025 WL 1570007
    (N.D. Fla. June 3, 2025) .........................................................2, 8, 9, 11, 15

## TABLE OF AUTHORITIES–CONTINUED

**Page(s)**

*Computer & Commc'ns Indus. Ass'n v. Uthmeier*,
   No. 4:24-cv-438-MW/MAF, 2025 WL 893403
   (N.D. Fla. Mar. 13, 2025) ...................................................................9

*Dart Cherokee Basin Operating Co. v. Owens*,
   574 U.S. 81 (2014)............................................................................12

*Department of Fair Emp. & Hous. v. Lucent Techs., Inc.*,
   642 F.3d 728 (9th Cir. 2011) ...........................................................26

*Florida v. Exxon Mobil Corp.*,
   No. 4:10-cv-21-RH/WCS, 2010 WL 11579390
   (N.D. Fla. April 16, 2010) ................................................................30

*Florida v. Memberworks, Inc.*,
   No. 8:03-cv-2267-T-26TGW, 2003 WL 27374081
   (M.D. Fla. Dec. 23, 2003)................................................................30

*Government of Puerto Rico v. Express Scripts, Inc.*,
   119 F.4th 174 (1st Cir. 2024) ..........................................................20

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
   No. 3:19-MD-2885, 2020 WL 365617 (N.D. Fla. Jan. 22, 2020).................24

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
   No. 3:19-MD-2885, 2020 WL 5835311 (N.D. Fla. Oct. 1, 2020) .........14, 15

*Jax Leasing, LLC v. Xiulu Ruan*,
   359 F. Supp. 3d 1129 (S.D. Ala. 2019) .........................................25

*Jefferson Cnty., Ala. v. Acker*,
   527 U.S. 423 (1999).........................................................................21

*Latiolais v. Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) ...........................................................22

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) .........................................................12

*LG Display Co. v. Madigan*,
   665 F.3d 768 (7th Cir. 2011) ...........................................................30

## TABLE OF AUTHORITIES–Continued

**Page(s)**

*Magnin v. Teledyne Cont'l Motors*,
    91 F.3d 1424 (11th Cir. 1996) ....................................................19

*McMahon v. Presidential Airways, Inc.*,
    502 F.3d 1331 (11th Cir. 2007) ..................................................18

*Mesa v. California*,
    489 U.S. 121 (1989).......................................................................14

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
    571 U.S. 161 (2014).......................................................................26

*Missouri ex rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) .......................................................29

*Missouri, Kan., & Tex. Ry. Co. v. Hickman*,
    183 U.S. 53 (1901)..............................................................27, 28, 30

*Mitev v. Resort Sports Ltd.*,
    133 F. Supp. 3d 1365 (S.D. Fla. 2015).........................................34

*Moore v. Electric Boat Corp.*,
    25 F.4th 30 (1st Cir. 2022) ...........................................................32

*MSP Recovery Claims, Series LLC v. Hanover Ins. Co.*,
    995 F.3d 1289 (11th Cir. 2021) ....................................................33

*Navarro Sav. Ass'n v. Lee*,
    446 U.S. 458 (1980).......................................................................26

*Nevada v. Bank of America Corp.*,
    672 F.3d 661 (9th Cir. 2012) .......................................................26

*Ohio v. GMAC Mortg., LLC*,
    760 F. Supp. 2d 741 (N.D. Ohio 2011) ...........................27, 28, 31

*Pittman v. Tractor Supply Co.*,
    No. 3:24-cv-547-TKW-ZCB, 2024 WL 5103028
    (N.D. Fla. Dec. 13, 2024) .............................................................13

*Ruppel v. CBS Corp.*,
    701 F.3d 1176 (7th Cir. 2012) .....................................................19

## TABLE OF AUTHORITIES–Continued

**Page(s)**

*Schleider v. GVDB Operations, LLC,*
    121 F.4th 149 (11th Cir. 2024) ....................................................16

*State ex rel. Guste v. Fedders Corp.,*
    524 F. Supp. 552 (M.D. La. 1981) ................................................28

*State v. Meadows,*
    88 F.4th 1331 (11th Cir. 2023) ......................................12, 22, 24

*Watson v. Philip Morris Co.,*
    551 U.S. 142 (2007) ............................................ 3, 13-16, 18

*Willingham v. Morgan,*
    395 U.S. 402 (1969) ..................................................3, 14

**STATUTES:**

Fla. Stat. §§ 501.1736—.1738 (2024) ........................................8

Fla. Stat. § 501.1736 ................................................................8

Fla. Stat. § 501.1736(1)(e)(4) ................................................10

Fla. Stat. § 501.1736(2)(a) ......................................................8

Fla. Stat. § 501.1736(2)(b)(1) ..................................................8

Fla. Stat. § 501.1736(3)(a) ......................................................9

Fla. Stat. § 501.1736(3)(b)(1) ..................................................9

Fla. Stat. § 501.1736(3)(b)(3) ..................................................9

Fla. Stat. § 501.1736(5) ..........................................................26

Fla. Stat. § 501.1736(6) ....................................................29, 30

Pub. L. No. 111-31, § 2, 123 Stat. 1776 (2009) ........................16

6 U.S.C. § 473(b)(2)(B)(i) ......................................................16

6 U.S.C. § 473(b)(2)(F) ..........................................................16

## TABLE OF AUTHORITIES–CONTINUED

**Page(s)**

21 U.S.C. § 387a(e) .................................................................16

21 U.S.C. § 393(d)(2)(D) .........................................................16

28 U.S.C. § 1332 ....................................................... 11, 12, 32

28 U.S.C. § 1367(a) ................................................................32

28 U.S.C. § 1441(a) ................................................................12

28 U.S.C. § 1442(a)(1)................................................ 12, 21, 23

28 U.S.C. § 1446(a) ................................................................12

**OTHER AUTHORITIES:**

DHS, *DHS Know2Protect and Snap Inc. Launch Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024) ....................... 5, 6

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3726 (4th ed., Apr. 2021 update) ..................................32

## INTRODUCTION

Snapchat, operated by Defendant Snap Inc., is one of the world's most popular communications platforms.  It is specifically designed for expression and hosts speech from all manner of speakers, about all manner of topics.  It can help connect speakers to the audiences they most want to reach.

One of the speakers who relies on Snapchat to achieve its messaging goals is the federal government.  For the last several years, Snap has assisted the federal government with two vital public messaging campaigns targeted at the nation's young adults aged 13 to 17.  First, it has collaborated with the Department of Homeland Security on Know2Protect, which educates teenagers about the risks of child sexual exploitation and abuse.  Second, it has worked alongside the Food and Drug Administration's campaigns aiming to reduce teenage use of nicotine and tobacco products.  For both programs, Snap has worked with the agencies on the front end to shape the content delivered to users, and on the back end to satisfy the agencies' requests to specifically target these campaigns to users aged 13 to 17.

This lawsuit filed by the State of Florida's Department of Legal Affairs ("DLA") greatly jeopardizes Snap's ability to continue providing these important services to the federal government within Florida.  The lawsuit seeks to enforce Florida's HB3, which both outright bars and imposes severe restrictions on minor users' ability to access social media sites.  The Complaint asks the Court to hold

1

Snap liable for *all* services it provided in Florida to minor users aged 13 to 15 in 2025, and to enjoin all future service in the State to 13-year-olds and all service to 14- and 15-year-olds whose parents have not provided advance consent.

Like HB3, the lawsuit takes a one-size-fits-all approach to regulating minors' access to Snap. It sweeps in Snap's work on behalf of the federal government, right alongside the vast amount of "protected speech" that this Court recognized "proliferate[s]" on Snapchat. *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 4:24-cv-438-MW/MAF, 2025 WL 1570007, at *10 (N.D. Fla. June 3, 2025) (quotation marks omitted) ("*CCIA*").

DLA also sues under the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"), claiming that certain design features on Snapchat are unfair and that Snap's age-appropriateness ratings deceive users by misrepresenting the amount of mature content on the app. These claims, too, directly relate to Snap's work with the federal government because Snap uses several of the challenged design features in fulfilling the federal agencies' requests, and the content produced by those agencies falls within DLA's definition of "mature content."

DLA's claims violate federal law in numerous respects. This Court has already held that HB3 likely violates the First Amendment because the law "burdens substantially more protected speech than necessary" through its "sweeping burden on the rights of youth" to access protected speech. *CCIA*, 2025 WL 1570007, at

2

*19.   DLA's claims are also preempted by the dormant Commerce Clause and federal statutes, and impermissibly burden Snap's own First Amendment rights in addition to those of its users.

The federal officer removal statute exists precisely to ensure that, when state litigation threatens to interfere with federal programs in this way, a federal forum will hear and rule on any federal defenses.  *See Watson v. Philip Morris Co.*, 551 U.S. 142, 150-151 (2007).  That statute extends to private parties—such as Snap— that work alongside federal officers, and the Supreme Court has repeatedly instructed that the statute's scope should not be given a "narrow, grudging interpretation."  *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  It should come as no surprise to DLA that, by setting its sights on *all* speech on Snapchat directed to users aged 13 to 15, the State's litigation has targeted important federal messaging aimed at those very users.

Federal jurisdiction is also proper here under the diversity statute.  In truth, DLA is a nominal party to this case, which seeks to vindicate the rights of a discrete, identifiable group of Floridians—namely, minors aged 13 to 15.  Under such circumstances, courts recognize that the citizenship of the real parties in interest should control.  Here, there is no dispute that Snap is diverse from all Florida residents and that far more than $75,000 is at stake.

3

The Court should accordingly deny DLA's Motion to Remand because this case is properly removable twice over.  At minimum, however, the Court should reject DLA's unfounded request for attorneys' fees and costs.  Snap's removal was undertaken in good faith and is well-supported by precedent.

## BACKGROUND

### I.    Snap Assists Federal Government Agencies In Fulfilling Their Statutory Mandates To Reach U.S. Teenagers With Important Public Service Messages.

Every day, more than 400 million people worldwide use Snapchat to connect with their friends and family, express themselves creatively, and learn about the world.  Users take "snaps" (photos) or videos through Snapchat's in-app camera, which they customize using Snapchat's filters, effects, and editing tools.  *See* Boyle Decl. ¶ 4.  The majority of "snaps" exchanged on the app are with friends and family, either in direct, private communications or compiled in "stories" viewable by users' Snapchat friends.  *Id.* ¶ 3. Users also can share or explore content from accounts around the world through the Discover and Spotlight features.  *Id.* ¶ 4.

For Snap's teen users, Snapchat is not just a means to learn about the world, but a way to shape it. Young people leverage Snapchat to communicate, organize, educate themselves, and to have fun.  And Snapchat has a particularly wide reach among this population: Millions of its U.S. users are aged 13 to 17.  Howells Decl. ¶ 4.

Snap partners with two federal agencies, the Department of Homeland Security ("DHS") and the Food and Drug Administration ("FDA"), to assist those agencies in reaching teenagers with important public service messages. DHS partnered with Snap as its foundational collaborator on Know2Protect, Murray Decl. ¶ 4, to ensure that this first-of-its-kind federal campaign about online child sexual exploitation and abuse "directly" reaches its "key audience[]: teens." DHS, *DHS Know2Protect and Snap Inc. Launch Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024) ("DHS Press Release").[1]

DHS's Cyber Crimes Center and Child Exploitations Investigations Unit have entered into multiple Memorandums of Understanding (MOUs) to direct and guide Snap's work on the Know2Protect campaign. Murray Decl. Exs. A and B. The MOUs task Snap with assisting DHS in three distinct ways. First, Snap conducts research assessing teen and young adult Snapchatters' awareness of various (not Snapchat-specific) online child sexual exploitation and abuse risks, which helps DHS design an effective campaign. *Id.* ¶ 5. Second, Snap collaborates with DHS on building custom Know2Protect content for the Snapchat platform. *Id.* ¶ 6. In 2024, for example, Snap and DHS launched a custom Know2Protect "Lens," a Snapchat feature that adds interactive effects to users' videos. The Know2Protect Lens is "a fun and interactive quiz" designed specifically to engage teenagers by

---

[1] *Available at* https://perma.cc/6LEW-277X.

making learning about online risks into "an entertaining adventure."   DHS Press

Release.  A sample view of the Lens is shown here:



**Murray Declaration, Exhibit C**

Finally, Snap gives DHS advertising credits that DHS uses to promote the

Know2Protect campaign on Snapchat.  *Id.* ¶ 10.  DHS has used the vast majority of

those advertising credits to reach teenage users aged 13 to 18.  *Id.* ¶ 11.

Similarly, Snap assists FDA's Center for Tobacco Products with public

outreach campaigns that address tobacco and nicotine use by minors. Snap began

working with FDA in 2019, when the platform ran the first of numerous "The Real

Cost" anti-tobacco and anti-vaping campaigns targeted to Snapchatters aged 13 to

17.  Howells Decl. ¶ 3.  A Senior Client Specialist at Snap assists FDA in designing and optimizing their teen outreach campaigns.  *Id.* ¶¶ 1-2.  A sample advertisement is shown here:



**Howells Declaration, Exhibit B**

FDA's three approved 2025 campaigns illustrate how Snap assists the agency. First, FDA sends campaign briefs to Snap that outline the agency's objectives.  In 2025, all three campaigns exclusively targeted teenagers aged 13 to 17.  *Id.* ¶ 11. Based on those briefs, Snap creates custom media plans, which include recommendations on how to leverage Snap's tools and advertising options, including video advertisements and Lenses.  *Id.* ¶ 12.  Finally, once FDA approves Snap's

7

custom media plans, FDA purchases advertising on Snap's platform and targets users aged 13 to 17. *Id.* ¶ 14. FDA's contractor marketing agency typically places the orders on FDA's behalf. *Id.* The marketing agency agrees to Snap's Business Services Terms on behalf of FDA, which state that they are "a legally binding contract between Snap and [FDA]." Howells Decl. Ex. F. FDA exercises final approval of all advertising content shown on Snap. *Id.* ¶ 7.

## II. HB3 Sharply Curtails Snap's Ability To Assist The Federal Government.

Florida's HB3 seeks to eliminate or severely restrict the rights of teens aged 13 to 15 to access Snap and other social media platforms. 2024 Leg., Reg. Sess. (Fla. 2024) (codified at Fla. Stat. §§ 501.1736—.1738). The law applies to social media platforms that (1) allow users to both upload content and view the content and activity of other users; (2) use at least one of five features alleged to be "addictive," such as content "algorithms," "infinite scrolling," and "auto-play video" features; and (3) are accessed for more than two hours daily by 10% of the platform's daily users under age 16. Fla. Stat. § 501.1736.

For platforms that fall within HB3's scope, "the law's restrictions are an extraordinarily blunt instrument for furthering" the state's goals of "limiting the exposure of youth to websites with [allegedly] 'addictive features.'" *CCIA*, 2025 WL 1570007 at *15. HB3 holds covered platforms liable for providing *any* service to 13-year-olds. Fla. Stat. §§ 501.1736(2)(a), (b)(1). HB3 would thus penalize Snap

8

for assisting DHS and FDA in reaching these teenagers with their important public service messages. Further, HB3 requires removing teenagers aged 14 and 15 from Snapchat unless they obtain advance parental consent. Fla. Stat. §§ 501.1736(3)(a), (b)(1), (b)(3). As a practical matter, parental verification imposes significant burdens on Snap, users, and their parents, and Snap has not previously required parental consent for teen users. *See* Boyle Decl. ¶¶ 5, 17. Thus, HB3 would also punish Snap for assisting the federal agencies in reaching 14- and 15-year-olds.

## III.    DLA Opposes A Federal Pre-Enforcement Preliminary Injunction And Files Suit In State Court.

In October 2024, Internet trade associations CCIA and NetChoice filed suit to enjoin DLA from enforcing HB3. *See CCIA*, 2025 WL 1570007, at *2. CCIA and NetChoice invoked associational standing. Although Snap is a NetChoice member, DLA argued the trade associations lacked standing because they had not shown any member established a concrete threat of enforcement. *Id.* The Court agreed but noted that "it seem[ed] the evidentiary deficiency could be easily fixed" and granted leave to amend. *CCIA v. Uthmeier*, No. 4:24-cv-438-MW/MAF, 2025 WL 893403, at *3 n.8 (N.D. Fla. Mar. 13, 2025).

At the end of March, Plaintiffs filed a First Amended Complaint and renewed motion for a preliminary injunction that contained additional standing allegations. *CCIA*, 2025 WL 1570007, at *2. On the same day that DLA opposed that motion, it also filed this lawsuit in state court.

DLA's Complaint ("Compl.") has two claims.  Count I seeks to hold Snap liable under HB3 for serving teenagers aged 13 to 15 after the law went into effect on January 1, 2025.  Compl. ¶¶ 140-141.  This time period includes Snap's implementation of DHS and FDA's requests to target content at 13- to 15-year-old users.  While HB3 only imposes liability for serving 14- and 15-year-olds without parental permission, as a practical matter verifying parental consent is burdensome, complicated, and involves serious privacy concerns.  *See* Boyle Decl.  ¶ 17.  Snap has not required parental consent in 2025.  Functionally, then, the Complaint seeks to hold Snap liable for all service it has provided to 14- and 15-year-olds since January 1, 2025.

Count II seeks to hold Snap liable under FDUTPA.  Compl. ¶¶ 146-155.  DLA alleges that certain Snap design features, including its unique content algorithm, *id.* ¶¶ 76-77, and its Spotlight and Discover features, *id.* ¶¶ 32-33, violate FDUPTA by "promot[ing] compulsive, prolonged, and unhealthy use by children."  *Id.* ¶ 149.  Several of these same features are part of the formula that determines whether Snap is a covered social media platform for purposes of HB3.  *See* Fla. Stat. § 501.1736(1)(e)(4).  Snap uses some of these features to implement DHS and FDA campaigns and ensure advertising reaches the teenage population specifically targeted by the federal agencies.  Howells Decl. ¶ 11; Murray Decl. ¶ 12.  DLA further alleges Snap violates FDUPTA by misrepresenting the amount of

"sexualized, drug-related, and other mature content" on its platform, including "[a]lcohol, tobacco, and drug use or references on Snapchat." Compl. ¶¶ 152, 80.

DLA seeks an injunction prohibiting further violations of HB3 and FDUTPA and civil penalties "of up to $50,000 for each violation" of HB3, *id.*¶ 144, which could be construed to seek a penalty for each of the alleged "tens of thousands of users who are under 16 years old [in Florida]." *Id.* ¶ 11.  DLA also seeks punitive damages under HB3.  *Id.* ¶ 145.  As for Count II, DLA seeks civil penalties for Snap's "willful violations of FDUPTA," *id.* at 35,  which authorizes penalties of up to $10,000 per violation.  *See* Fla. Stat. § 501.2075.

Snap timely removed to this Court, invoking the Court's jurisdiction under both the federal officer removal statute, 28 U.S.C. § 1442(a)(1), and the general diversity statute, 28 U.S.C. § 1332.  Dkt. 1.  DLA filed a Motion to Remand ("Motion").  Dkt. 14-1.

After removal, this Court enjoined DLA from enforcing HB3 in *CCIA*, holding the law is likely unconstitutional given that it "burdens substantially more protected speech than necessary because it imposes the same sweeping burden on the rights of youth under 16 despite the availability… of substantially less burdensome alternatives." *CCIA*, 2025 WL 1570007 at *19.  But the Court indicated that the parties should proceed with briefing on pending motions in this matter. *Id.* at *21 n.34.

11

## LEGAL STANDARD

A party may remove a civil action to federal court when the litigation is "directed to" "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). A party may also remove any civil action over which a federal court would "have original jurisdiction," 28 U.S.C. § 1441(a), including based on diversity of citizenship under 28 U.S.C. § 1332.

At the time of removal, the defendant must provide only "a short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). "By design," this language "tracks the general pleading requirement" for a complaint under Rule 8. *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014). Thus—just as a plaintiff need not substantiate the facts alleged in a complaint at the time of filing—a removing defendant need not provide evidence corroborating the facts alleged in the notice of removal until "the plaintiff contests, or the court questions, the defendant's allegation." *Id.* at 89.

For this reason, DLA is simply wrong when it faults Snap for failing to provide "evidentiary support" alongside its Notice of Removal. Motion 23-24. Snap was only required to provide evidence if DLA mounted a "factual attack" on the Notice of Removal by contesting its allegations. *Leite v. Crane Co.*, 749 F.3d 1117, 1121-22 (9th Cir. 2014); *accord State v. Meadows*, 88 F.4th 1331, 1348 (11th Cir.

12

2023) (favorably citing *Leite*).  Even now, DLA does not appear to actually contest any of the facts in the Notice of Removal.  The Court may therefore assume those allegations are true under *Dart Cherokee*.

If the Court construes DLA's Motion as a factual attack, however, Snap now provides declarations and supporting exhibits corroborating all the allegations in its Notice of Removal.  *See Pittman v. Tractor Supply Co.*, No. 3:24-cv-547-TKW-ZCB, 2024 WL 5103028, at *1 (N.D. Fla. Dec. 13, 2024) ("The Court is not limited to the information in the notice of removal . . . and it may also consider any evidence submitted in response to the motion to remand.").  In response to a factual attack, Snap "must prove by a preponderance of the evidence" the facts relevant to jurisdiction.  *Anderson v. Wilco Life Ins. Co.*, 943 F.3d 917, 925 (11th Cir. 2019).  "To determine whether" Snap has carried that burden, the Court "may rely on evidence put forward by the removing defendant, as well as reasonable inferences and deductions drawn from that evidence."  *Id.*

## ARGUMENT

### I.  This Court Has Jurisdiction Under The Federal Officer Removal Statute.

The federal officer removal statute exists "to protect the Federal Government from the interference with its operations" arising from state litigation.  *Watson*, 551 U.S. at 150 (quotation marks omitted).  The statute "applies to private persons who

lawfully assist the federal officer in the performance of his official duty." *Id.* at 151 (quotation marks omitted).

Snap must meet three requirements to satisfy this statute. *First*, Snap "must show that it . . . acted under a federal officer." *Caver v. Central Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017). *Second*, the suit must be "for or relating to any act under color of such office." *Id.* (quoting 28 U.S.C. § 1442) (emphasis omitted). And *third*, Snap must raise a colorable federal defense to satisfy Article III's requirement that the case arise under federal law. *Mesa v. California*, 489 U.S. 121, 136 (1989). "Federal officer removal is thus an exception to the well-pleaded complaint rule." *Caver*, 845 F.3d at 1145.[2]

The Supreme Court has repeatedly emphasized that the federal officer removal statute must be "liberally construed." *Watson*, 551 U.S. at 147; *see Willingham*, 395 U.S. at 407 (statute "should not be frustrated by a narrow, grudging interpretation"). Thus—contrary to DLA's repeated assertions (at 4, 10, 11)— "[w]hen applying the federal officer removal statute, the Court does not resolve any doubts in favor of remand." *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No.

---

[2] For this reason, DLA is wrong to assert that "removal is *only* permissible when plaintiff's claim could have been filed in federal court originally." Motion 10 (quoting *Burns v. Windsor Ins. Co.*, 31 F.3d 1092, 1095 (11th Cir. 1994)) (emphasis added). The quoted case involved only diversity removal.

3:19-MD-2885, 2020 WL 5835311, at *3 n.9 (N.D. Fla. Oct. 1, 2020) (quotation marks omitted).

Each of the DHS and FDA programs that Snap assists independently satisfies the elements for federal officer removal. Indeed, DLA does not contest that the multiple federal defenses raised in the Notice of Removal clear the "colorable" threshold—unsurprisingly, given that this Court has already ruled that HB3 likely violates the First Amendment. *See CCIA*, 2025 WL 1570007, at *10-19. The remaining elements are likewise met.

### 1. Snap Meets The "Acting Under" Requirement.

Snap is "acting under" both DHS and FDA within the meaning of Section 1442(a)(1) when assisting with their Know2Protect and Real Cost campaigns. The "acting under" requirement is "broad." *Watson*, 551 U.S. at 147. In *Watson*, the Supreme Court explained that a defendant satisfies the requirement when acting "to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152. Although merely "*complying* with [federal] law," is not sufficient, the statute's requirements are met when a defendant is "help[ing the federal] officers fulfill other basic governmental tasks," not tasks of their own. *Id.* at 152, 153.

Snap's acts clearly meet this requirement because Snap is helping federal agencies fulfill their statutory obligations. DHS's Child Exploitation Investigations

Unit must conduct "outreach and training activities" related to its responsibilities for "child exploitation prevention." 6 U.S.C. § 473(b)(2)(F); (B)(i). And FDA is required to "conduct[] educational and public information programs relating to [the agency's] responsibilities," 21 U.S.C. § 393(d)(2)(D), which includes implementing the 2009 Tobacco Control Act. 21 U.S.C. § 387a(e). A key objective of that Act is to curb tobacco and nicotine use by young adults. Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, § 2, 123 Stat. 1776, 1776-81 (2009). Thus, when Snap collaborates with DHS or FDA to design their public service campaigns, and then implements their instructions to target those campaigns to Snapchatters aged 13 to 17, Snap is "assist[ing]" and "help[ing] carry out" the statutorily mandated "duties" and "tasks" of these agencies. *Watson*, 551 U.S. at 152. In doing so, Snap helps the agencies "fulfill" their "congressional objective[s]." *Caver*, 845 F.3d at 1144.

The Eleventh Circuit has recognized that such activities fall within the federal officer removal statute when they are "help[ing] the government to produce [something] that it needs," *id.*, and "act[ing] under an agreement with a federal agency to provide a service," *Schleider v. GVDB Operations, LLC*, 121 F.4th 149, 158 (11th Cir. 2024). Snap does both: It produces research and digital products needed by DHS—including research and Know2Protect content like the Lens—and it provides advertising services to both DHS and FDA. With both, Snap helps the

agencies "fulfill a basic governmental task," *id.*, which satisfies Section 1442(a)(1)'s "acting under" requirement.  In the words of Kate Kennedy, the campaign manager from DHS, "[t]he collaboration between Snap and Know2Protect is instrumental in helping [DHS] reach key demographics with critical awareness and prevention messaging."  Murray Decl. ¶ 14.  According to Ms. Kennedy, "this [collaboration] is making a real difference in saving lives."  *Id.*

DLA disputes that Snap is "acting under" either DHS or FDA.  Its argument rests in large part on an extended discussion of the Eleventh Circuit's decision in *Caver*.  *See* Motion 26.  But even a cursory examination of *Caver*'s facts shows that the case favors Snap, not DLA.  Snap's work for DHS and FDA demonstrates a *more* "'extensive interrelationship between the federal government and Defendant'" than in *Caver*—a case the Eleventh Circuit concluded *was* properly removed.  *Id.* (quoting *Caver*, 845 F.3d at 1138).

In *Caver*, defendant Central Alabama Electric Cooperative was a non-profit rural electric cooperative, created by Alabama state law, whose only modern relationship with the federal government was "substantial loans" it received from the Department of Agriculture.  845 F.3d at 1139.  These loans contain standardized terms that impose extensive federal regulatory requirements, but in the wake of *Watson*, the "federal regulations alone [were] not enough to satisfy the federal officer removal statute."  *Id.* at 1143.  So the Eleventh Circuit looked to the history

of state rural electric cooperatives—which emerged to advance Congress's rural electrification scheme, and now are obligated to operate according to Congress's design via the terms of federal loans—and concluded that the Cooperative "helps assist or carry out the [electrification] duties of" the federal government by virtue of its existence. *Id.*

No such historical investigation is required here: Unlike the Cooperative, Snap has active service agreements with DHS and FDA to assist with carrying out their statutory duties. Contrary to DLA's suggestion (at 28), Snap need not "identif[y] any historical basis for a longstanding entwinement" with the federal government; that investigation was only necessary in *Caver* because the Cooperative was not directly providing services to the federal government.[3]

DLA also faults Snap for claiming it acts under the federal government without alleging that "the federal government 'controls almost all of [its] actions,' as the Court required in *Caver*." Motion 28 (quoting *Caver*, 845 F.3d at 1146). But that *Caver* passage has nothing to do with the "acting under" requirement. It is from

---

[3] Snap's agreements with the government provide that they do not create a common law "agency" relationship. *See* Howells Decl. Ex. F; Murray Decl. Exs. A, B. But the broad "acting under" does not require an agency relationship; it requires only "an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152 (emphasis omitted); *see, e.g.*, *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1343 n.14 (11th Cir. 2007) (noting in federal officer removal case that the court had "expressly . . . not determined" that the contractor had "establish[ed] agent status").

an irrelevant section of the opinion concerning whether the Cooperative had raised a colorable federal preemption defense.

DLA next implies (at 28) that since Snap is not "'a non-profit entity funded in part by federal loans,'" it should be considered "'a private business working for its own ends.'" Motion 28 (quoting *Caver*, 845 F.3d at 1144). But that is not the relevant inquiry. Many, if not most, nongovernmental defendants that remove under Section 1442(a)(1) work for profit. *See, e.g., Anesthesiology Assocs. of Tallahassee, Fla., P.A. v. Blue Cross Blue Shield of Fla., Inc.,* No. 03-15664, 2005 WL 6717869 (11th Cir. Mar. 18, 2005) (health insurer); *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424 (11th Cir. 1996) (engine manufacturer); *Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012) (turbine manufacturer); *Bennett v. MIS Corp.*, 607 F.3d 1076 (6th Cir. 2010) (mold remediation firm).

The relevant inquiry is instead whether the defendant's work is "on behalf of the government" or entirely for a business's "own ends." *Caver*, 845 F.3d at 1144. Here, Snap provides individualized assistance to federal agencies on public service campaigns "conceived of and directed by the federal government." *Id.* That is work on behalf of the government, regardless of whether Snap earns a profit. In any event, Snap has not earned revenue as part of its collaboration with DHS on the Know2Protect program. *See* Murray Decl. Exs. A and B. Snap assists with that

19

federal program because it agrees with and seeks to help the government achieve its goals.

Finally, DLA cites the media agencies involved in Snap's assistance to DHS and FDA, portraying the relationships as mediated by "middlemen." Motion 26, 29. As a factual matter, that is incorrect. Snap has direct relationships with both agencies as well as their media agencies. *See* Howells Decl. ¶ 8, Murray Decl. ¶ 7. As a legal matter, it is irrelevant: Courts around the country have concluded that federal subcontractors can invoke Section 1442(a)(1). *See Board of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.,* 996 F.3d 243, 254 (4th Cir. 2021) ("[T]he absence of a *direct contractual relationship* with the federal government is *not* a bar to removing an action under § 1442(a)(1) … if this were not the case, the availability of the federal officer removal statute would be significantly curtailed as federal contracts are often carried out, at least in part, through subcontractors."); *Government of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 182 n.2 (1st Cir. 2024) (similar); *Agyin v. Razmzan*, 986 F.3d 168, 178 (2d Cir. 2021) (similar).

Today, the federal government relies extensively on subcontractors. *See Arlington*, 996 F.3d 254. If Section 1442(a)(1) were read to exclude subcontractors, significant swaths of federal operations would be unprotected. This would violate the Supreme Court's instructions that the federal officer removal statute be "liberally construed to give full effect to the purposes for which they were enacted." *Colorado*

*v. Symes,* 286 U.S. 510, 517 (1932).  Thus, even if Snap's only relationship with the agencies were through a federal contractor (and it is not), Snap could still remove.

DLA's characterization of Snap's interactions with the federal government as "episodic" is similarly irrelevant.  Motion 25, 28-29.  Meeting frequency on its own is not significant—in *Caver*, there was no indication of any meetings.  Rather, Snap need only communicate with DHS and FDA frequently enough to ensure the agencies are guiding Snap's work on their campaigns—which it does.  *See* Murray Decl. ¶ 8, Howells Decl. ¶¶ 4, 8.

### 2. Snap Meets The Nexus Requirement.

Both counts of the Complaint seek to hold Snap liable for its conduct "for *or relating to* any act under color of [federal] office."  28 U.S.C. § 1442(a)(1) (emphasis added).  Congress added the "or relating to" language in the Removal Clarification Act of 2011, expanding removal under the statute.  Under the previous iteration, the Supreme Court required a "'causal connection' between the charged conduct and asserted official authority" to "establish that the suit is 'for' any act under color of office."  *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 424 (1999) (quoting § 1442(a)(1)).  By adding the phrase "or relating to," Congress "intended to broaden the scope of acts that allow" removal.  *Caver*, 845 F.3d at 1144 n.8.  Section

1442(a)(1) now "requires only a 'connection' or 'association' between the act in question and the federal office." *Id.* at 1144 (internal citations omitted).[4]

Snap easily clears the "quite low" "hurdle erected by this requirement." *Caver*, 845 F.3d at 1144 (quotation marks omitted).  In *State v. Meadows*, the Eleventh Circuit clarified that assessing federal officer removal starts by "identify[ing] the act or . . . conduct" at issue, which in turn is "defined by the claim[s] brought against the defendant."  88 F.4th at 1343 (internal quotation marks omitted).  Here, Count I claims Snap is liable for "openly and admittedly" serving any 13-year-olds and 14- and 15-year-olds without parental consent.  Compl. ¶¶ 140-141.  That service is the "culpable 'act' " for platforms covered by HB3.  *Meadows*, 88 F.4th at 1344.

Thus, the Complaint would hold Snap liable for fulfilling DHS and FDA's requests to target public service messages to users aged 13 to 17.  There is *at least* a "connection" and "association" between Snap's acts under the color of the federal agencies (implementing the advertisement requests), which is the "only" thing required by Section 1442(a)(1).  *Caver*, 845 F.3d at 1144.  Indeed, the circumstances

---

[4] Although some Eleventh Circuit cases continue to reference a "causal connection," *see e.g.*, *Meadows*, 88 F.4th at 1343, *cert. denied*, 145 S. Ct. 545 (2024), these cases show that causal standard is satisfied by a "connection or association," *Caver*, 845 F.3d at 1144 (quotation marks omitted); *see Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc) (describing Eleventh Circuit's approach).

here would meet even the more stringent causal test employed before the 2011 amendment. "[T]he acts for which [Snap] is being sued . . . occurred because of [Snap's] performance of its duties" in implementing the federal agencies' advertising requests. *Id.* at 1145.

So too for Count II, which seeks to impose FDUPTA liability for Snap's alleged "choice to design Snapchat to include features known to promote compulsive, prolonged, and unhealthy use by children." Compl. ¶ 149. These allegedly unlawful design features are used to fulfill the federal agencies' advertising campaigns, which rely on Snapchat's unique content selection algorithm, *id.* ¶¶ 76-77, and leverage Snapchat's Spotlight and Discover features, *id.* ¶¶ 32-33. In particular, Snap relies on these features to reach the campaign's target teenage audience with maximum impressions, meaning those features "relat[e] to" implementing the federal agencies' requests. 28 U.S.C. § 1442(a)(1).

Additionally, Count II claims Snap violates FDUPTA in part based on "sexualized, drug-related, and other mature content" allegedly on the platform. *Id.* ¶ 152. Given the ambiguity of these terms, DHS's campaign concerning sexual exploitation risks could conceivably be encompassed, while FDA's campaigns concerning nicotine and tobacco use constitute "tobacco, and drug use or references

on Snapchat," *id.* at ¶ 89—meaning that Snap violates FDUPTA "because of" implementing the agencies' requests. *Caver*, 845 F.3d at 1145.[5]

DLA dedicates far less space to contesting whether this "connection or association" requirement is met. *Caver*, 845 F.3d at 1144 (quotation marks omitted). Regarding HB3, DLA claims the only relevant Snap conduct is "voluntarily adopt[ing]" the features that bring Snap within the scope of HB3, not providing service to teen users aged 13 to 15. Motion 29. But this runs headlong into *Meadows,* which makes clear that "for purposes of federal-officer removal," the relevant conduct is the "defendant's culpable act." 88 F.4th at 1344 (internal quotations omitted). Thus, if providing services to users aged 13 to 15 is connected to Snap's activities on behalf of the federal government, the nexus requirement is satisfied. *See, e.g., In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2020 WL 365617, at *4 (N.D. Fla. Jan. 22, 2020) (finding requisite connection where "the *actions challenged by Plaintiffs*… involve actions that Defendants maintain were performed… in connection with their contractual relationship with the government" (emphasis added)); *Arlington*, 996 F.3d at 257 (claim related to acts under the federal government when it "necessarily includes activity that is directly connected to the [federal] contract"). And, regardless, Snap employs design features that trigger the

---

[5] FDA's cigarette campaigns were not specifically targeted to Florida users, but users in Florida could access content from those campaigns. *See* Howells Decl. ¶ 13. FDA's anti-vaping campaigns specifically targeted Florida users. *See id.*

coverage formula in fulfilling the agencies' advertising goals. *See* Murray Decl. ¶ 12; Howells Dec. ¶ 11.

On Count II, Snap agrees with DLA that the relevant culpable acts asserted in the Complaint include Snapchat's use of allegedly "harmful design features" and hosting content that DLA considers harmful for minors. *See* Motion 29-30. But DLA is just wrong that those "in [no] way relate to" Snap's work "promoting advertisements for the two federal agencies." *Id.* As Snap explained in its Notice of Removal, Dkt. 1 ¶ 58, and has corroborated with declarations, *see* Murray Decl. ¶ 12; Howells Decl. ¶ 11, Snap relies on challenged design features to successfully implement the federal public service campaigns. *See supra* pp. 10, 23. Moreover, the content of those federal campaigns falls within DLA's exceptionally broad conception of what constitutes harmful content for minors. *See supra* pp. 23-24. Those features thus at minimum "related to" the work Snap does under the color of those agencies even if they are not the entire "basis for the relief demanded." *See, e.g., Jax Leasing, LLC v. Xiulu Ruan*, 359 F. Supp. 3d 1129, 1141 (S.D. Ala. 2019).

In short, the nexus requirement imposes only a "low bar"—one Snap easily clears. Removal was appropriate under the federal officer removal statute.

## II.    The Court Has Diversity Jurisdiction Because DLA Is Not The Real Party In Interest.

DLA's lawsuit seeks principally to enjoin purely private commercial transactions among a discrete, narrowly defined group of identifiable parties

authorized by law to vindicate their own rights: Florida adolescents aged 13 to 15 who have or would seek to use Snapchat.  The citizenship of that limited, identifiable group controls for purposes of diversity jurisdiction.[6]

For diversity purposes, the citizenship of a "nominal or formal" party in the litigation must be "disregard[ed]."  *See Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 461 (1980).  When a state entity is named as a party, federal courts must determine "the real party in interest," rather than simply relying on the names of the parties, to determine if there is diversity jurisdiction.  *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 174 (2014).  "[T]he question as to whether or not the state is the real party in interest must be determined by the essential nature and effect of the proceeding as it appears from the entire record."  *Department of Fair Emp. & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 740 (9th Cir. 2011).[7]  Identifying the nature of the State's interest "is a matter for case-by-case development."  *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 607 (1982).

DLA's lawsuit principally seeks redress for alleged injuries to a narrow group: minors under 16 who contract or seek to contract with Snapchat.  Fla. Stat. § 501.1736(5).  The primary remedy DLA seeks is to terminate or restrict contractual

---

[6] DLA does not contest that the amount-in-controversy is satisfied.

[7] DLA is wrong to suggest that the Ninth Circuit has confined *Lucent* to its facts. *See* Motion 19.  That court's subsequent opinion in *Nevada v. Bank of America Corp.* reaffirmed that the analysis depends on "the essential nature and effect of the proceeding."  672 F.3d 661, 670 (9th Cir. 2012) (quoting *Lucent*, 642 F.3d at 740).

rights between that narrow group and Snap, which necessarily inures for the benefit of that specific group. Indeed, DLA's temporary injunction motion filed in state court sought just that, *see* Dkt. 1-1 at 69, as does its Complaint. Compl. ¶ 143. That DLA incidentally seeks civil penalties does not mean the lawsuit is designed to benefit Florida's citizens generally. *See Ohio v. GMAC Mortg., LLC*, 760 F. Supp. 2d 741, 751 (N.D. Ohio 2011) (holding requests for "civil penalties and punitive damages" to be paid to the state treasury did "not require a finding that Ohio [was] the real-party-in-interest").

In its Motion, DLA casts its interest as pursuing legal violations of state law and the resulting purported "real-world" harm that stem from those violations. Motion 13. More specifically, DLA argues it has an interest in the welfare of its "youth . . . their teachers, families, and communities," *id*., and that a finding of jurisdiction in this case would "flood the federal courts" with attorney general enforcement suits. *Id*. at 22. These arguments are unpersuasive.

*First*, evaluating the basic nature of DLA's claims, as required by Supreme Court precedent, establishes that any benefits from this litigation inure principally for the benefit of the individuals who are the subject of HB3. In *Missouri, Kansas, & Texas Railway Co. v. Hickman*, the Supreme Court held that a railway company was entitled to remove a case filed by a state agency because the state was not the real party in interest. The Court noted that "it may be fairly held that the state is

such real party when the relief sought is that which inures to it alone." 183 U.S. 53, 59 (1901).

The Court reasoned that, while civil penalties may benefit the public generally, such a general governmental interest does not make the state the real party in interest. *See id*. Otherwise, "the state would be a party in interest in all litigation." *Id*. at 60. In finding the state was not the real party in interest, the Supreme Court noted that the thrust of the action was to compel a railway company to charge bridge users legal rates. *Id*. The railway company and bridge users were "the real parties in interest." *Id*. at 59-60. Just so here: DLA's suit seeks to compel Snap to change its interactions with an identifiable group of users.

Other courts have reached similar conclusions. In *Ohio v. GMAC Mortg., LLC*, the court found that Ohio homeowners were the real parties in interest in an action brought by the State "seeking relief from mortgage companies' use of 'robosigners' to process mortgage foreclosure paperwork." 760 F. Supp. 2d at 743-744. Likewise, in *State ex rel. Guste v. Fedders Corp.*, the court concluded that an action brought against a manufacturer of temperature control devices under state consumer protection laws seeking to "make the consumers of Louisiana whole" rendered those consumers the real parties in interest. 524 F. Supp. 552, 557-558 (M.D. La. 1981).

This case is of a piece.  Here, DLA seeks principally to enjoin purely private commercial transactions among a discrete group of identifiable private parties.  But those private parties are already authorized to vindicate their own rights.  *See* Fla. Stat. § 501.1736(6) (creating a private right of action).  The State is not a real party-in-interest when it sues on behalf of a discrete group of individuals who are "capable of pursuing their own interests."  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653 (9th Cir. 2017).

*Second*, DLA posits that the basis for its civil enforcement action is "harm [] to the people of Florida, who are protected by both H.B. 3 and FDUTPA."  Motion 13.  But HB3 is not directed at the consuming public.  By DLA's own concession in *CCIA*, HB3 seeks to protect a discrete and specifically identifiable group.  *See CCIA*, ECF No. 86 at 3 ("[T]he Florida Legislature passed HB3 to protect children . . . ."); *id*. at 9 ("HB3 protects children from platforms with addictive features by regulating the platforms' contracts with children."); *id*. at 55 (arguing HB3 serves the compelling interest of "protecting the physical and psychological well-being of minors").[8]

---

[8] This does not mean that DLA is powerless to protect this group.  This Court is fully capable of adjudicating the issues and providing a means by which DLA may seek redress.  Moreover, had these individuals sought relief through HB3's private right of action, any such action would most certainly have been removable.

29

Even accepting Florida's interest in protecting the well-being of its citizens generally, *Hickman* indicates that when DLA acts for the benefit of a particular identifiable group, it becomes a nominal party on behalf of the affected citizens. *See* Fla. Stat. § 501.1736(6); *Hickman*, 183 U.S. at 59 (State is a real party in interest when the relief sought "inures to it alone"); *see also American Lung Ass'n of N.H. v. American Lung Ass'n*, No. CIV. 02-108-B, 2002 WL 1728255, at *2 (D.N.H. July 25, 2002) (the state was a nominal party where it had no "interest in the action apart from its general interest in protecting its citizens from the misuse of assets").

*Third*, DLA's invocation of its *parens patriae* authority fails on similar grounds. HB3 stands in stark contrast to DLA's cited cases where attorneys general were the real parties in interest, because the lawsuits at issue were, again, pitched more broadly at consumers generally. *See, e.g.*, *AU Optronics Corp. v. South Carolina*, 699 F.3d 385, 387 (4th Cir. 2012) (antitrust suit for price fixing of LCD panels sold to "citizens" generally); *LG Display Co. v. Madigan*, 665 F.3d 768, 770 (7th Cir. 2011) (antitrust suit for inflated television prices sold to "residents" broadly); *Florida v. Exxon Mobil Corp.*, No. 4:10-cv-21-RH/WCS, 2010 WL 11579390, at *1 (N.D. Fla. Apr. 16, 2010) (price gouging the public); *Florida v. Memberworks, Inc.*, No. 8:03-cv-2267-T-26TGW, 2003 WL 27374081, at *3 (M.D. Fla. Dec. 23, 2003) (marketing of memberships to the public).

DLA's enforcement action, by contrast, seeks relief for a narrow, identifiable group of Floridians as private parties.  Florida "must articulate an interest apart from the interests of particular private parties" because Florida's assertion of quasi-sovereign interest is limited to the "health and well-being—both physical and economic—of its residents *in general*."  *Snapp*, 458 U.S. at 607 (emphasis added).

The Supreme Court has cautioned that, when a State exercises its *parens patriae* authority, "more must be alleged than injury to an identifiable group of individual residents."  *Id*.  Although "indirect effects of the injury" must be considered, *see id*., any indirect injury here has not "affect[ed] a sufficiently substantial segment of the state's population."  *See GMAC*, 760 F. Supp. 2d at 749-750.

*Fourth*, DLA's suggestion (at 27) that a ruling in Snap's favor would "flood the federal courts with all manner of statement enforcement suits" misses the mark because it disregards unique aspects of HB3.  Unlike the run-of-the-mill consumer protection statutes, HB3 and this action are atypical because they are directed to a specifically identifiable group of Floridians.  Therefore, this action, like *Hickman, GMAC,* and *Fedders Corp.*, is the exception—not the rule.  DLA enforcement actions that seek to redress harm to the consuming public at large may be pursued in state courts.  But this action does not seek to redress harm to the 23 million-plus

31

Floridians that make up the consuming public; instead, it is specifically directed at Snap users in Florida "who are under 16 years old."  Dkt. 1-1 at 4, ¶ 11.

Accordingly, DLA is a nominal party because the primary relief it seeks inures to the benefit of a discrete group of Florida's citizens: minors between 13 and 15. The citizenship of those citizens controls, allowing Snap to remove this case under § 1332.

### III.    The Court Has Supplemental Jurisdiction Under Section 1442(a)(1) and Section 1367.

This Court has grounds to exercise jurisdiction over both claims.  Yet should the Court doubt original jurisdiction on one of the two claims at issue, it also has supplemental jurisdiction over the other under both Sections 1442(a)(1) and 1367. The federal officer removal statute "'creates a species of statutorily-mandated supplemental subject-matter jurisdiction'" by "'authoriz[ing] removal of the entire action even if only one of the controversies it raises involves a federal officer or agency'"; as long as "[a]ny single claim is independently sufficient to satisfy" federal officer removal, the whole action goes to federal court.  *Moore v. Electric Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022) (quoting  Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3726 (4th ed., Apr. 2021 update)).

Additionally, as the Notice of Removal explains, this Court can exercise Section 1367 supplemental jurisdiction, as both counts are "so related … that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Tellingly, DLA

does not seriously contest that this Court has supplemental jurisdiction over one count if it has original jurisdiction over the other, or argue that the claims are so unrelated that supplemental jurisdiction would be inappropriate—relegating the issue to a single footnote. Motion 30 n.2. Here, DLA's claims overlap substantially because they challenge the lawfulness of many of the same Snapchat design features.

## IV.    Fees And Costs Are Plainly Unwarranted.

The Court should reject DLA's request for attorneys' fees and costs. Snap removed this case in good faith and it has strong legal authority to support its removal arguments.

Attorneys' fees and costs are generally appropriate under Section 1447(c) "only where the removing party lacked an objectively reasonable basis for seeking removal." *MSP Recovery Claims, Series LLC v. Hanover Ins. Co.*, 995 F.3d 1289, 1296 (11th Cir. 2021) (quotation marks omitted). This can include a situation where a party makes "factual misrepresentations" or "frivolous legal arguments," but courts have properly refused to award fees merely because there is "adverse," but non-controlling, precedent. *Id.*

Snap's arguments for removal in this case are a far cry from "objectively unreasonable." With respect to federal officer removal, DLA does not cite *any* cases purporting to reject jurisdiction on facts that resemble those here. *See* Motion 22-30. Quite to the contrary: DLA's leading case, *Caver*, is one where the Eleventh

Circuit determined that jurisdiction was proper on a much more indirect connection to the federal government than the one Snap has with DHS and FDA. *See supra* pp. 17-18. And it is DLA's Motion that contains multiple mistakes about the law governing federal officer removal—including asserting that doubts should be resolved against removal, *supra* p. 14; that Snap was obligated to provide evidence with its Notice of Removal, *supra* p. 12; and that Snap was required to show that the federal government entirely "controlled" its actions in this case, *supra* pp. 18-19.

Regarding diversity jurisdiction, DLA has shown at most that there is some disagreement among courts about whether removal was proper. DLA's repeated refrain that Snap's asserted cases are "out-of-circuit" gives away the game. *See, e.g.*, Motion 1, 12, 20 n.1. Although DLA urges this Court not to follow those cases, it is not able to identify any *controlling* precedent in this jurisdiction. *Cf.* Motion 19 (asserting, wrongly, that "binding circuit precedent would foreclose Snap's diversity jurisdiction argument *if this case were in the Ninth Circuit*" (emphasis added)). It is not "objectively unreasonable" for Snap to argue that the courts holding removal is proper have the better of this debate. *See, e.g.*, *Mitev v. Resort Sports Ltd.*, 133 F. Supp. 3d 1365, 1372 (S.D. Fla. 2015) (holding removal was not

"objectively unreasonable" where there was "disagreement among district courts" (quotation marks omitted)).[9]

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's Motion to Remand and its request for attorneys' fees and costs.

---

[9] If the Court grants the Motion, Snap respectfully requests that the Court refrain from sending the "certified copy" of its Order to the state court as provided by 28 U.S.C. § 1447(c) while Snap exercises its statutory right to appeal under 28 U.S.C. § 1447(d).

Dated: June 13, 2025

Respectfully submitted,

/s/ Christopher M. Kise

Katherine B. Wellington (PHV)
HOGAN LOVELLS US LLP
125 High Street
Boston, MA, 02110
katherine.wellington@hoganlovells.com
Tel: (617) 702-7745

Reedy C. Swanson (PHV)
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, D.C., 20004
reedy.swanson@hoganlovells.com
Tel: (202) 637-5764

*Attorneys for Defendant Snap Inc.*

Christopher M. Kise
Florida Bar No. 855545
Lazaro P. Fields
Florida Bar No. 1004725
CONTINENTAL PLLC
101 N. Monroe Street
Suite 750
Tallahassee, FL, 32301
ckise@continentalpllc.com
chris@ckise.net
lfields@continentalpllc.com
cforjet@continentalpllc.com
Tel: (850) 332-0702

A. Benjamin Gordon
Florida Bar No. 528617
Anne N. Izzo
Florida Bar No. 1016166
ANCHORSGORDON, P.A.
2113 Lewis Turner Boulevard
Suite 100
Fort Walton Beach, FL, 32546
bgordon@anchorsgordon.com
aizzo@anchordgordon.com
mary@anchorsgordon.com
Tel: (850) 863-1974

36

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court using CM/ECF to be served on counsel of record.

/s/ Christopher M. Kise
Christopher M. Kise

## <u>CERTIFICATE OF COMPLIANCE</u>

This memorandum complies with the type-volume limitation of Local Rule 7.1(F) because this memorandum contains 7,930 words, excluding the parts of the memorandum exempted by Local Rule 7.1(F).

June 13, 2025                          <u>/s/ Christopher M. Kise</u>
                                       Christopher M. Kise